1   IKE LAWRENCE EPSTEIN, ESQ.
    Nevada Bar No. 4594
2   ERIC D. HONE, ESQ.
    Nevada Bar No. 8499
3   CRAIG J. CARLSTON, ESQ.
    Nevada Bar No. 8977
4   BECKLEY SINGLETON, CHARTERED
5   530 Las Vegas Blvd. South
    Las Vegas, Nevada 89101
6   Telephone: (702) 385-3373
7   Facsimile: (702) 385-9447
    Attorneys for Plaintiff/Counter-defendant
8   MCC Special Purpose Corporation VIII

9

10              **UNITED STATES DISTRICT COURT**

11                  **DISTRICT OF NEVADA**

12

13  MCC SPECIAL PURPOSE CORPORATION      )   Case No.: CV-S-04-KJD-PAL
    VIII, a Nevada corporation,          )
14                                        )
                 Plaintiff,              )
15                                        )   **PLAINTIFF'S MOTION FOR**
    vs.                                   )   **PARTIAL SUMMARY JUDGMENT**
16                                        )   **AND ALTERNATIVE MOTION**
    BRANDYWINE HEALTH SERVICES OF        )   **FOR PRELIMINARY INJUNCTION**
17  MISSISIPPI, INC., aka Choctaw County Medical )
    Center, a Mississippi corporation, JEFFREY A. )
18  MORSE, an individual, and DOES 1-10, )
                                          )
19               Defendants.             )
                                          )
20  ────────────────────────────────────)
                                          )
21  BRANDYWINE HEALTH SERVICES OF        )
    MISSISIPPI, INC., aka Choctaw County Medical )
22  Center, a Mississippi corporation, JEFFREY A. )
    MORSE, an individual,                )
23                                        )
             Counter-claimants,          )
24                                        )
    vs.                                   )
25                                        )
    MCC SPECIAL PURPOSE CORPORATION      )
26  VIII, a Nevada corporation, and DOES 1-10, )
                                          )
27           Counter-defendants.         )
                                          )
28  ────────────────────────────────────)

{00168006;}                    1

1       Plaintiff/Counterdefendant, MCC Special Purpose Corporation VIII, ( "MCC"),

2  by and through its counsel at the law firm of Beckley Singleton, Chtd., hereby moves this Court for

3  the entry of an order granting partial summary judgment as to its First, Second, Third, Fourth, Sixth

4  and Seventh Causes of Action and for an order granting summary judgment as to Defendants'

5  counterclaims.

6       In the event the Court is not inclined to grant summary judgment as requested above, MCC

7  requests the Court enter a preliminary injunction enjoining defendants Brandywine Health Services

8  of Mississippi, Inc. ("Brandywine") and Jeffrey A. Morse ("Morse") from transferring, moving,

9  concealing, dispersing or disposing of funds received by Brandywine for payment on accounts

10  receivable owned by MCC or upon accounts in which MCC has a first priority lien or security

11  interest.  In order to effectuate the requested injunction, MCC requests the Court enter an order

12  requiring the creation of an escrow account to hold such funds until such time as this matter is

13  resolved and the parties' rights are determined.  MCC additionally requests that the Court enter an

14  order requiring Brandywine to provide an accounting of all funds it has received in payment on the

15  subject accounts and to continue to make such an accounting on a bi-monthly basis for payments it

16  may receive in the future.

17       These motions are brought pursuant to Federal Rule of Procedure 56 and 65, and are based

18  upon the following Points and Authorities, the Affidavit of Thomas R. Fazio ("Aff. Fazio") attached

19  hereto as Exhibit A, the pleadings and papers on file herein and any oral argument permitted by the

20  Court.

21  **POINTS AND AUTHORITIES**

22  **I.  INTRODUCTION**

23       In the complaint filed by MCC (the "Complaint"), MCC asserted eight causes of

24  action Defendants Brandywine and Morse.  MCC now seeks entry of an order granting summary

25  judgment on the following claims:  (1) Breach of Contract against Brandywine (First Cause of

26  Action); (2) Breach of Guaranty against Morse (Second Cause of Action); (3) Breach of Implied

27  Covenant of Good Faith and Fair Dealing against Brandywine and Morse (Third Cause of Action);

28  (4) Breach of Fiduciary Duty against Brandywine (Fourth Cause of Action); (5) Intentional


BECKLEY
SINGLETON
ATTORNEYS AT LAW
530 LAS VEGAS BLVD SOUTH
LAS VEGAS, NEVADA 89101

{00168006;}                                        2

1   Interference with Prospective Economic Advantage against Brandywine and Morse (Sixth Cause of

2   Action); (6) Conversion against Brandywine and Morse (Seventh Cause of Action); and (7)

3   Declaratory Judgment.  MCC also requests that an order of summary judgment be entered dismissing

4   the counterclaims brought by Brandywine and Morse including their claims for breach of contract,

5   breach of the implied covenant of good faith and fair dealing and for rescission.  MCC requests

6   summary judgment on the basis that no genuine issues of material fact exist as to the relevant issues

7   and Plaintiff is entitled to judgment as a matter of law.

8   **II.      STATEMENT OF UNDISPUTED FACTS**

9   **The Purchase Agreement and Guaranty**

10          MCC is a private investor-funded company that purchases uncollected medical accounts

11  receivable and health-care insurance receivables from medical providers in order to provide a return

12  to its investors.   On or about August 10, 2004, Brandywine entered into a written Purchase

13  Agreement whereby Brandywine agreed to sell to MCC certain uncollected accounts receivable.

14  (*See* Purchase Agreement, attached as Ex. 1 to the Fazio Aff.; Fazio Aff., ¶ 4.)  Pursuant to the terms

15  of the Purchase Agreement, Brandywine sold to MCC accounts receivable with an aggregate face

16  value of $559,461.62, but with a contractually agreed upon value of $318,957.38.   (Purchase

17  Agreement, Exhibit A.)  In exchange for the sale of the accounts receivable and in full compliance

18  with the plain terms of the Purchase Agreement, MCC immediately paid Brandywine the advance

19  rate amount ($255,165.90), less the origination fee ($9,568.73), for a sum total of $245,597.18.

20  (Fazio Aff., ¶ 5; Purchase Agreement, Exhibit A.)  Defendants accepted and retained the advance

21  rate payment from MCC, but have failed to pay MCC any of the amounts due and owing under the

22  Purchase Agreement. (Fazio Aff., ¶ 6.)

23          To secure performance under the terms of the Purchase Agreement, a UCC-1 Financing

24  Statement was filed with the Secretary of State of the State of Mississippi on August 10, 2004,

25  securing all of MCC's rights and interests in and to any medical accounts receivable, *inter alia*, then

26  existing or thereafter arising. (Fazio Aff., ¶ 7; Ex. 2.)

27          On August 10, 2004, as a contemporaneous part of the Purchase Agreement, and as a

28  material inducement to MCC to enter into the Purchase Agreement, Morse executed and delivered to


BECKLEY
SINGLETON
ATTORNEYS AT LAW
530 LAS VEGAS BLVD SOUTH
LAS VEGAS, NEVADA 89101

{00168006;}                                      3

1 │ MCC a Guaranty ("Guaranty") whereby he guaranteed payment of any and all sums that may

2 │ become due and owing by Brandywine under the terms of the Purchase Agreement.  (Purchase

3 │ Agreement, p. 20.)  Specifically, the Guaranty provided:

> The undersigned hereby personally, absolutely and unconditionally guarantee(s), jointly and severally, the payment and performance of the Provider's [Brandywine Health] representations, warranties and covenants under this Agreement and resulting from and/or incurred in connection with any breach by Provider thereof.  The undersigned shall be primarily liable for such obligations and buyer [MCC] may invoke the benefits of this guaranty without pursuing any remedies against Provider, without the necessity of joining all guarantors in any action hereon, and without proceeding against any collateral for such obligation.

9 │ (*Id.*)

10 │ The Purchase Agreement provides that, should Brandywine breach its obligations under the

11 │ agreement, it shall be obligated to "repurchase" the accounts by paying to MCC the entire aggregate

12 │ adjusted value of the accounts receivable, minus any collections already received by MCC.

13 │ (Purchase Agreement, § 2.1(f).)  In this case, the repurchase amount, or total aggregate adjusted

14 │ value of the accounts sold to MCC is $318,957.38.  (Purchase Agreement, Exhibit A.)  Under the

15 │ terms of the Purchase Agreement, unpaid obligations incur interest at an agreed upon rate of 18%

16 │ from the date due until paid.  (Purchase Agreement, § 8.15.)

17 │ **Defendants' breach of the Purchase Agreement and Guaranty**

18 │ On August 12, 2004, almost immediately after receiving payment of the contractually agreed

19 │ upon amount of $245,597.17, Defendants breached the Purchase Agreement by, among other things,

20 │ sending a written letter to MCC purporting to unilaterally terminate the agreement and expressly

21 │ stating their intention to interfere with MCC's contractual right to collect on the purchased accounts

22 │ receivable.  (Fazio Aff., ¶ 8, Ex. 3.)  Defendants unambiguously declared their intention not to

23 │ perform their obligations under the Purchase Agreement and Guaranty stating, "we will not continue

24 │ this program with your company under present circumstances," and "[w]e are asking you to send us

25 │ a final invoice covering the $249,597.18[1] and any reasonable associated costs."  (Fazio Aff., Ex. 3.)

---

[1] Defendants misstated the amount that was paid to them by MCC.  The actual amount paid by MCC to the Defendants was the advance rate amount of $255,165.90, less an origination fee of $9,568.73, totaling $245,597.17.

BECKLEY
SINGLETON
ATTORNEYS AT LAW
530 LAS VEGAS BLVD SOUTH
LAS VEGAS, NEVADA 89101

1    To date, Defendants have failed to repay any of the money paid to them under the terms of the

2    Purchase Agreement.

3         Defendants not only retained MCC's payment for the accounts receivable while affirmatively

4    failing and refusing to perform their obligations under the Purchase Agreement and Guaranty, but

5    also clearly stated their intention to affirmatively interfere with MCC's contractual right to collect on

6    the accounts.  Specifically, Defendants stated that they would be informing payors on the accounts

7    "not to accept any documents for attachment of our funds." (Fazio Aff., Ex. 3.)

8         Because of the Defendants' immediate breach of the Purchase Agreement and Guaranty,

9    MCC has collected no monies from the accounts receivable nor any amount due from the

10   Defendants, leaving a balance due and owing of $318,957.38, plus interest at the contractual rate and

11   attorneys fees and costs. (*See* Purchase Agreement §§ 2.1(f), 8.14, 8.15, Exhibit A.)

## III.    LEGAL ARGUMENT

### A.    LEGAL STANDARD FOR MOTIONS FOR SUMMARY JUDGMENT

14        Pursuant to the Federal Rules of Civil Procedure, "[a] party seeking to recover upon a

15   claim…may, at any time after the expiration of 20 days from the commencement of the

16   action…move with or without supporting affidavits for a summary judgment in the party's favor

17   upon all or any part thereof." FED. R. CIV. P. 56(a).  Granting summary judgment is proper and

18   "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions

19   on file, together with affidavits, if any, show that there is no genuine issue as to any material fact,

20   and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). "A

21   material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve

22   the parties' differing versions of the truth." *Mirage Resorts, Inc. v. Stirpe*, 152 F. Supp.2d 1208,

23   1213, *citing, Securities and Exchange Comm'n v. Seaboard Corp.*, 677 F.2d 1289, 1293 (9th Cir.

24   1982).

25        The party moving for summary judgment has the burden of showing the absence of a genuine

26   issue of fact, and the court must view all facts and inferences drawn in the light most favorable to the

27   responding party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598 (1970).  Once

28   the burden has been met, the "opposing party must then present specific facts demonstrating that

BECKLEY
SINGLETON
ATTORNEYS AT LAW

530 LAS VEGAS BLVD SOUTH
LAS VEGAS NEVADA 89101

{00168006.}                                    5

1  there is a factual dispute about a material issue." *Zoslaw v. MCA Distrib. Corp.,* 693 F.2d 870, 883

2  (9th Cir. 1982).  The nonmoving party "may not defeat a motion for summary judgment in the absence

3  of any significant probative evidence tending to support his legal theory." *Commodity Futures*

4  *Trading Comm'n v. Savage,* 611 F.2d 270, 282 (9th Cir. 1979).

**B.  MCC HAS MET ITS OBLIGATIONS UNDER THE PURCHASE AGREEMENT; BRANDYWINE AND MORSE HAVE BREACHED THEIR OBLIGATIONS UNDER THE PURCHASE AGREEMENT AND GUARANTY.**

**1.  Defendant's breach of the Purchase Agreement and Guaranty**

8  On August 10, 2004, MCC entered into valid and existing contracts with Brandywine and

9  Morse, namely the Purchase Agreement and the Guaranty.  MCC performed all the promises,

10 covenants and conditions it agreed to perform under the terms of the Purchase and Guaranty

11 Agreements by delivering the agreed upon amount of $245,597.17 to Brandywine Health.  In return,

12 Brandywine was to convey certain accounts receivable and all rights therein to MCC.  (Purchase

13 Agreement, §§ 1.1, 2.1(f), Exhibit A.)  Morse expressly guarantied Brandywine's obligations under

14 the Purchase Agreement.  (Purchase Agreement, p. 20.)

15 On August 12, 2004, almost immediately after receiving payment of the contractually agreed

16 upon advance rate, Defendants breached the Purchase Agreement by expressly stating, among other

17 things, that they would refuse to perform the obligations expressly set forth in and required by the

18 Purchase Agreement and expressly stating their intention to interfere with MCC's contractual right

19 to collect on the purchased accounts receivable.  (Fazio Aff., Ex. 3.)  Defendants unambiguously

20 declared their intention not to perform their obligations under the Purchase Agreement.  (*Id.*)

21 Despite having expressly breached their obligations under the Purchase Agreement and Guaranty,

22 Defendants have failed to "repurchase" the accounts and pay to MCC the aggregate adjusted value

23 of the accounts, i.e., $318,957.38, as agreed upon within the Purchase Agreement.  (Fazio Aff., ¶ 9;

24 *See* Purchase Agreement, § 2.1(f), Exhibit A.)

**2.  MCC has met all of its obligations under the Purchase Agreement**

26 It their letter of August 12, 2004, Defendants allege that MCC's performance was not in

27 accordance with what the parties had agreed.  However, despite Defendants' baseless allegations, it

28 is evident that MCC fully performed its obligations under the contracts.



1    Under to the terms of the Purchase Agreement, Brandywine Health sold to MCC accounts
2 receivable with an aggregate face value of $559,461.62. (Purchase Agreement, § 1.1, Exhibit A.)
3 The parties agreed that these accounts would have a contractually agreed upon value of $318,957.38.
4 (Purchase Agreement, Exhibit A.)  In exchange for the sale of the accounts receivable, MCC agreed
5 to pay Brandywine Health sums totaling $245,597.18.  (Purchase Agreement, §§ 1.1, 2.1, Exhibit
6 A.)

7    On August 10, 2004, in full compliance with the plain terms of the Purchase Agreement,
8 MCC wired to Brandywine Health the advance rate amount ($255,165.90), less the origination fee
9 ($9,568.73), for a sum total of $245,597.18. (Fazio, Aff., ¶¶ 4-5; Ex. 3.)

10    **3.  Liability of Defendants based upon their breaches**

11    The Purchase Agreement provides that upon breach of the Purchase Agreement by
12 Brandywine, it shall be obligated to "repurchase" the accounts by paying to MCC the entire
13 aggregate adjusted value of the accounts receivable, minus any collections already received by
14 MCC.  (Purchase Agreement, § 2.1(f).)  The repurchase amount, or total aggregate adjusted value of
15 the accounts sold to MCC is $318,957.38. (Purchase Agreement, Exhibit A.)  Under the terms of the
16 Purchase Agreement, unpaid obligations incur interest at an agreed upon rate of 18% from the date
17 due until paid. (Purchase Agreement, § 8.15.)

18    **4.  The parol evidence rule bars allegations of conflicting oral agreements**

19    If, *arguendo,* there is any evidence supporting Defendants' allegations that the parties
20 actually agreed to perform obligations different from those otherwise expressly set forth in the
21 Purchase Agreement and Guaranty, such evidence is contrary to the express terms of the Purchase
22 Agreement and is barred by the parol evidence rule.

23    The parol evidence rule forbids the Court to receive or consider evidence that would vary or
24 contradict the express terms of a contract when all prior negotiations and agreements are deemed to
25 have been merged therein. *See, e.g., Kaldi v. Farmers Ins. Exchange,* 117 Nev. 273, 281, 21 P.2d
26 16, 21 (2001).  Where a written contract is clear and unambiguous on its face, extraneous evidence
27 cannot be introduced to explain its meaning.  (*Id.*)  Moreover, where parties have deliberately put
28 their agreement into writing, the writing is presumed to contain the entire contact and all prior and

BECKLEY
SINGLETON
ATTORNEYS AT LAW
530 LAS VEGAS BLVD SOUTH
LAS VEGAS NEVADA 89101

{00168006;}                                    7

1  contemporaneous agreements are merged therein and cannot be shown by parol evidence.

2  *Commodity Credit Corp. v. Rosenberg Bros. & Co.* 243 F.2d 504, 508 (9th Cir. 1957).

3      In this case, MCC and Defendants included an integration clause in the Purchase Agreement.

4  This clause expressly states that the parties intended the Purchase Agreement to be the final

5  expression of their entire bargain. Section 8.11 of the Purchase Agreement provides:

6      **Complete Agreement.** "THIS AGREEMENT, ANY PURCHASE

7  SUPPLEMENT, THE EXHIBITS AND SCHEDULES HERETO AND THE DOCUMENTS DELIVERED OR TO BE DELIVERED THE PARTIES HERETO WITH RESPECT TO THE TRANSACTIONS CONTEMPLATED

8  HEREIN AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL

9  AGREEMENTS OF THE PARTIES. NO MODIFICIATION OR AMENDMENT OF OR SUPPLEMENT TO THIS AGREEMENT OR SUCH

10  OTHER DOCUMENTS SHALL BE VALID OR EFFECTIVE UNLESS THE SAME IS IN WRITING AND SIGNED BY THE PARTY AGAINST WHOM

11  IT IS SOUGHT TO BE ENFORCED."

12  Accordingly, any evidence Defendants may attempt to introduce that is contrary to the plain terms of

13  the Purchase Agreement, including all the allegations of conflicting oral agreements found in the

14  counterclaim, are barred from being considered by the Court pursuant to the parol evidence rule. *See*

15  *Esteban v Userware International, Inc.,* 14 Cal.Rptr.2d 93, 96 (Cal. 1992).

16

17  **C.    MCC IS ENTITLED TO SUMMARY JUDGMENT AS TO ITS FIRST CAUSE OF ACTION FOR BREACH OF CONTRACT.**

18      As set forth above, there is no question of material fact concerning Brandywine's obligations

19  under the Purchase Agreement and its express breaches of its obligations thereunder. Based on

20  Brandywine's breaches of the Purchase Agreement, including its failure to convey the accounts to

21  MCC, its retention of the purchase price despite its breach, and its refusal to repurchase the accounts,

22  MCC has been damaged in the amount of $318,957.38, plus interest at the contractually agreed upon

23  rate and attorneys fees and costs. Because no question of material facts exists with regard to

24  Brandywine's breaches, MCC requests the Court enter an order granting summary judgment on this

25  cause of action.

26  / / /

27  / / /

28  / / /

{00168006;}    8

**D.    MCC IS ENTITLED TO SUMMARY JUDGMENT AS TO ITS SECOND CAUSE OF ACTION FOR BREACH OF GUARANTY.**

As detailed above, in the previous subsection, there is no question of material fact concerning Brandywine's obligations under the Purchase Agreement and its express breaches of its obligations thereunder.  Based on Brandywine's breaches of the Purchase Agreement and Morse's guaranty of Brandywine's obligations thereunder, Morse has become liable for Brandywine's breaches and all of its obligations to MCC.  *See, e.g., Threlkel v. Shenanigan's, Inc.,* 110 Nev. 1088, 1092, 881 P.2d 674, 676 (1994) (holding that pursuant to the guaranty agreement, the president of the corporation, as guarantor, incurred liability for all sums owed by the obligor to the obligees).

Because no question of material facts exists with regard to Brandywine's breaches, MCC requests the Court enter an order granting summary judgment on this cause of action.

**E.    MCC IS ENTITLED TO SUMMARY JUDGMENT AS TO ITS THIRD CAUSE OF ACTION FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.**

As set forth herein, MCC entered into valid and existing contracts with Brandywine and Morse, namely the Purchase Agreement and Guaranty.  MCC fully performed its obligations under the contracts while both Brandywine and Morse have breached the terms of the Purchase Agreement and Guaranty.

An implied covenant of good faith and fair dealing is implied in every contract.  *Consolidated Generator-Nevada, Inc. v. Cummins Engine Co., Inc.,* 114 Nev. 1304, 1311, 971 P.2d 1251, 1256 (1991).  Where a defendant deliberately contravenes the intention and spirit of the contract, the defendant becomes liable for breach of implied covenant of good faith and fair dealing.  *Morris v. Bank of America Nevada,* 110 Nev. 1274, 1278, 886 P.2d 454, 457 (1994).

In this case, Defendants clearly contravened the intention and spirit of the Purchase Agreement.  On August 12, 2004, almost immediately after receiving payment of the contractually agreed upon advance rate, Defendants unilaterally breached the Purchase Agreement unambiguously declaring their intention not to perform their obligations under the Purchase Agreement and to prevent MCC from exercising its rights to the accounts.  (Fazio Aff., Ex. 3.)

BECKLEY
SINGLETON
ATTORNEYS AT LAW
530 LAS VEGAS BLVD SOUTH
LAS VEGAS, NEVADA 89101

{00168006;}                                    9

1  Based on the foregoing, there are no genuine issues as to any material fact that Defendants

2  breached the covenant of good faith and fair dealing. Defendants have not only retained MCC's

3  payment for the accounts receivable while failing and refusing to convey the accounts to MCC, they

4  have also expressly stated their intention to interfere with MCC's contractual right to collect on the

5  accounts. Defendants' actions were in deliberate contravention of the intention and spirit of the

6  contract.

7  Because no question of material facts exists with regard to Brandywine and Morse's breach

8  of the implied covenant of good faith and fair dealing, MCC requests the Court enter an order

9  granting summary judgment on this cause of action.

10  **F.    MCC IS ENTITLED TO SUMMARY JUDGMENT AS TO ITS SIXTH CAUSE OF ACTION FOR INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC**

11  **ADVANTAGE.**

12  Intentional interference with prospective economic advantage is found where: (1) a

13  prospective contractual relationship exists between the plaintiff and a third party; (2) the defendant

14  knows of this prospective relationship; (3) the defendant acts intentionally to harm the plaintiff by

15  preventing the relationship; (4) the defendant has no privilege or justification for so acting; and (5)

16  defendant's actions harm the plaintiff. *Leavitt v. Leisure Sports, Inc.*, 103 Nev. 81, 88, 734 P.2d

17  1221, 1225 (1987).

18  In this case, as detailed above, MCC entered into entered into a valid Purchase Agreement

19  with Brandywine whereby Brandywine agreed to sell to MCC certain uncollected accounts

20  receivable. MCC fully performed its obligations under the Purchase Agreement and by so doing

21  was, and is, entitled to collect from the third-party payors on the subject accounts it purchased.

22  Defendants have intentionally interfered with and prevented MCC from obtaining the benefits of the

23  conveyance and sale of the accounts receivable by interfering with and preventing MCC from

24  collecting on the accounts. Defendants have done so by expressly advising the third-party payors

25  obligated to pay on the subject accounts receivable not to direct payment to MCC for amounts due

26  and owing on the subject accounts. (Fazio Aff., Ex. 3.)

27  Defendants had no privilege, right or justification for interfering with and preventing MCC

28  from collecting on the subject accounts receivable. As a result of Defendants' actions, MCC has not


BECKLEY
SINGLETON
ATTORNEYS AT LAW
530 LAS VEGAS BLVD SOUTH
LAS VEGAS, NEVADA 89101

1 collected any of the monies owed under the accounts.

2    There are no genuine issues of material fact regarding Defendants intentional interference

3 with MCC's right to collect on the accounts receivable from the third-party payors.  Accordingly,

4 MCC requests the Court enter an order granting summary judgment on this cause of action.

### G.    MCC IS ENTITLED TO SUMMARY JUDGMENT AS TO ITS SEVENTH CAUSE OF ACTION FOR CONVERSION.

7    As detailed above, MCC entered into a Purchase Agreement and Guaranty with Brandywine

8 and Morse.  MCC fully performed its obligations under the agreement while both Brandywine and

9 Morse have breached the terms of the Purchase Agreement and Guaranty.

10    Pursuant to the terms of the Purchase Agreement, Brandywine sold the accounts receivable to

11 MCC, making MCC the lawful owner of the accounts.  As owner of the accounts, MCC was, and is

12 entitled to collect on the accounts receivable and to possess all the money received in payment on

13 the accounts.  Defendants have wrongfully converted the accounts, preventing MCC from exercising

14 its interests therein.  *Wantz v. Redfield*, 74 Nev. 196, 198, 326 P.2d 413, 414 (1958) (defining

15 conversion as a distinct act of dominion wrongfully exerted over another's personal property in

16 denial of, or inconsistent with his title or rights therein or in derogation, exclusion, or defiance of

17 such title or rights).

18    In this case, Defendants have wrongfully exerted an act of dominion over the accounts by,

19 among other things, failing and refusing to convey the accounts to MCC and preventing MCC from

20 collecting on the accounts.  Defendants have failed and refused to pay over the amounts they have

21 received in payment on the accounts and have additionally failed and refused to repurchase the

22 accounts from MCC pursuant to the terms of the Purchase Agreement.  Defendants' actions are in

23 direct contravention of MCC's rights under the Purchase Agreement and Defendants have not, and

24 cannot, proffer any viable justification or excuse for such actions.

25    There are no genuine issues of material fact regarding Defendants conversion of the subject

26 accounts.  Accordingly, MCC requests the Court enter an order granting summary judgment on this

27 cause of action.

28

**H.    THE COURT SHOULD GRANT MCC'S MOTION FOR SUMMARY JUDGMENT AS TO ITS EIGHTH CAUSE OF ACTION AND ENTER AN ORDER SETTING FORTH AND DECLARING THE PARTIES' RIGHTS AND OBLIGATIONS UNDER THE PURCHASE AGREEMENT AND GUARANTY.**

A court may issue a declaratory judgment, clarifying parties' rights and obligations and clarifying unsettled legal relations. *Kress v. Corey*, 65 Nev. 1, 189 P.2d 352 (1948).  To obtain declaratory judgment, a justiciable controversy must exist between adverse parties, the plaintiff must have a legally protectible interest in controversy and the issue involved must be ripe for judicial determination. *Id.*

In this case, a dispute has arisen and an actual controversy exists between the MCC, Brandywine and Morse.   MCC claims that the Purchase Agreement and Guaranty required Defendants to convey to MCC certain accounts receivable; to assist MCC in collecting on those accounts receivable; to pay to MCC the deficiency between the agreed upon aggregate adjusted value of the accounts and the amounts actually collected; or, upon breach by Brandywine, to repurchase the accounts for the aggregate adjusted value of the accounts receivable, less collections made by MCC. (*See* Purchase Agreement, §§ 1.1, 1.2, 2.1, 2.2, 5.1, 5.5, Exhibit A.)    Defendants apparently claim that the Purchase Agreement and Guaranty do not bind them to the obligations set forth in therein and that they have no obligation to perform thereunder. (*See* Fazio Aff., Ex. 3.)

Based on the arguments set forth herein, MCC requests the Court enter an order declaring that Brandywine and Morse are in breach of their obligations under the Purchase Agreement and the Guaranty and, thus, are obligated to repurchase the accounts from MCC pursuant to the terms of the Purchase Agreement. (*See* Purchase Agreement, §§ 2.1, 2.2.)  In the alternative, MCC requests the Court enter an order declaring that MCC is entitled to the accounts, all funds collected thereon, and that Brandywine and Morse are obligated to pay to MCC any deficiency between the amounts collected thereon and the aggregate adjusted value of $318,957.38. (*Id.*)  In addition, MCC requests the Court enter an order declaring that Brandywine and Morse are liable for interest on the aggregate adjusted amount from August 12, 2004 to present, at the contractually agreed upon rate, and that the Defendants are obligated to reimburse MCC for its reasonable costs and attorneys fees incurred in this action. (*See* Purchase Agreement, §§ 8.14, 8.15.)

BECKLEY
SINGLETON
ATTORNEYS AT LAW
530 LAS VEGAS BLVD SOUTH
LAS VEGAS, NEVADA 89101

{00168006;}                            12

## I.  MCC IS ENTITLED TO AN ORDER SUMMARILY DENYING DEFENDANTS COUNTERCLAIMS.

Based upon the facts and legal theories discussed herein, MCC is entitled to an order denying the Defendants' counterclaims for breach of contract and breach of the implied covenant of good faith and fair dealing.  As discussed herein, MCC has fully complied with the express written terms of the Purchase Agreement and has performed faithfully thereunder.  Defendants arguments to the contrary are wholly based on inadmissible allegations regarding contemporaneous oral agreements that contradict the express terms of the Purchase Agreement.  These allegations are inadmissible and can have no bearing on the fact that MCC has met its obligations under the Purchase Agreement while Defendants have breached theirs.

In addition to being entitled to summary judgment as to Defendants' counterclaims for breach of contract and breach of the implied covenant of good faith and fair dealing, MCC is entitled to summary judgment regarding the counterclaim for rescission.  Rescission is only appropriate in two circumstances.  Legal rescission may be warranted where a party has committed a "material breach" of the contract.  *Great Am. Ins. Co. v. Gen. Builders, Inc.*, 113 Nev. 346, 355, 934 P.2d 257, 262 n.6 (1997).  Equitable rescission may be warranted where a mutual mistake occurs by the contracting parties.  *Gramanz v. Gramanz*, 113 Nev. 1, 8, 930 P.2d 753, 758 (1997); *See Great Am. Ins.*, 113 Nev. at 346, n.6, 934 P.2d at 262.

Rescission is not appropriate in this case because grounds do not exist for either legal or equitable rescission.  As to legal rescission, there has been no breach of the Purchase Agreement by MCC.  Rather, Brandywine and Morse have breached their obligations, accepting payment under the Purchase Agreement yet refusing to perform their obligations thereunder.  As such, the Defendants are not entitled to legal rescission.  *Bergstrom v. DeVoe*, 109 Nev. 575, 577, 854 P.2d 860, 861 (1993) (holding that party is not entitled to rescission where it has retained the benefits of the contract but has repudiated its burdens).

Additionally, there was no mutual mistake in the formation of the parties' contractual relationship.  While MCC cannot speak for the Defendants, the express terms of the Purchase Agreement and Guaranty signed by the Defendants are clear and provide precisely the terms expected

1    by MCC. *Gramanz*, 113 Nev. at 8, 930 P.2d at 758 (mutual mistake occurs "when both parties, at the

2    time of contracting, share a misconception about a vital fact upon which they base their bargain.").

3    MCC entertained no misconceptions at the time of contracting and, thus, there was no mutual

4    mistake. As such, the Defendants are not entitled to equitable rescission. *See Id.*

5         Because there are no questions of material fact with regard to Defendants' counterclaims, and

6    because the applicable law establishes that Defendants are not entitled to the relief they seek, MCC is

7    entitled to an order on summary judgment dismissing the counterclaims.

8    **J.    IN THE EVENT THE COURT IS NOT INCLINED TO GRANT SUMMARY
          JUDGMENT, MCC REQUESTS THE COURT ENTER A PRELIMINARY
9          INJUNCTION ORDER.**

10        In the event the Court is not inclined to grant MCC's motion for summary judgment at this

11   time, the Court should enjoin Brandywine from transferring, moving, concealing, disposing of or

12   disbursing any funds or assets collected on the subject accounts, which funds rightfully belong to

13   MCC. In addition, the Court should enjoin Brandywine from transferring, moving, concealing,

14   disposing of or disbursing any funds or assets received in payment on the accounts receivable upon

15   which MCC has a first priority lien or security interest, up to the amount needed to protect MCC's

16   ability to collect on the judgment it is likely to receive in this case. Brandywine should be so

17   enjoined in order to preserve the status quo of the parties with regard to the subject funds pending

18   determination by the Court of the parties' rights and obligations under the Purchase Agreement.

19        MCC requests that the Court effect this injunction by requiring the creation of an escrow

20   account to hold funds received by Brandywine for payment on the accounts owned by MCC. MCC

21   additionally requests the Court order that funds received in payment on the accounts receivable upon

22   which MCC has a lien and secured interest be directed into the escrow account to the extent

23   necessary for the account to total funds equaling the amount likely to be recovered by MCC in this

24   matter, i.e., $318,957.38. Finally, MCC requests that the Court order Brandywine to provide an

25   accounting of all funds it has received in payment on the subject accounts and to provide further

26   accountings, on a bi-monthly basis, regarding payments it may receive in the future.

27   / / /

28   / / /

BECKLEY
SINGLETON
ATTORNEYS AT LAW
VEGAS VEGAS BLVD SOUTH
LAS VEGAS, NEVADA 89101

{00168006.}                                    14

1    **1.      Basis and Authority for Injunctive Relief.**

2        Preliminary injunctions are issued to protect the moving party from irreparable injury and to

3    preserve the status quo until such time as the underlying action is resolved. *Michel v. Bare*, 230

4    F.Supp.2d 1147, 1149 (D.Nev. 2002).

5        Rule 65 of the Federal Rules of Civil Procedure authorizes the Court to grant injunctive relief

6    to a party that demonstrates either: (1) a combination of probable success on the merits and the

7    possibility of irreparable harm; or (2) that serious questions are raised and the balance of hardships

8    tips in its favor. *Michell*, 230 F.Supp.2d at 1149; *Wal-Mart v. County of Clark*, 125 F.Supp.2d 420,

9    424 (D.Nev. 1999). Both standards are met in this case. As to the first standard, MCC is likely to

10   succeed on the merits of it claims. During the course of the litigation, however, MCC is likely to be

11   irreparably harmed as Brandywine continues to liquidate the funds due to MCC from the accounts

12   receivable. As to the second standard, serious questions exist as to Brandywine's actions. The

13   balance of hardship tips in MCC's favor because it does not have possession or control of the

14   accounts receivable and is being precluded by Brandywine's actions from accessing, collecting on or

15   using the funds to which it is entitled.

16       Considering the two standards set forth above, and applying the facts in the case at bar, it is

17   apparent that a preliminary injunction should issue. The Court, therefore, should issue a preliminary

18   injunction and enjoin Defendants from further transferring, moving, concealing or disposing of any

19   funds or assets that rightfully belong to MCC or, as needed, on accounts in which MCC has a

20   secured interest.   Failure to issue a preliminary injunction may render a judgment against

21   Brandywine ineffectual as it is likely that Brandywine will have diverted or absconded with MCC's

22   funds by the time a judgment can be obtained.

23   **2.      MCC is Likely to Succeed on the Merits of this Case.**

24       As set forth above, MCC is likely to prevail in this action, in the event it is not immediately

25   entitled to summary judgment. MCC is entitled to the preliminary injunction it seeks because it can,

26   and has demonstrated a reasonable probability of success on the merits in conjunction with the

27   likelihood of irreparable harm (*see* Subsection III.J.3, below).

28

BECKLEY
SINGLETON
ATTORNEYS AT LAW
530 LAS VEGAS BLVD SOUTH
LAS VEGAS NEVADA 89101

3.      **Plaintiff Will Suffer Irreparable Injury if the Injunction is Not Granted.**

In addition to being likely to prevail on its claims against Brandywine, MCC will suffer irreparable injury if an injunction is not granted. Where a plaintiff is likely to prevail on the merits, the burden to show irreparable harm is substantially reduced. *See Wal-Mart Stores, Inc. v. County of Clark*, 125 F.Supp.2d 420, 429.

If Brandywine is permitted to continue to collect and divert the funds owed to MCC, it is foreseeable that Brandywine will no longer be in possession of such funds, or any sufficient funds or property, by the time this matter is resolved and a judgment entered against Brandywine. As evidenced by the fact that Brandywine and Morse have failed and refused to repurchase the accounts or to repay the money it has wrongfully collected from MCC, there is good reason to believe that Brandywine and Morse are in a precarious financial position and my be unable to satisfy a judgment against them absent immediate intervention of this Court.

Accordingly, in order to ensure that MCC will be able to collect on its judgment and obtain possession of the funds to which it is entitled, an injunction must issue. Without such Court intervention, MCC will be irreparably harmed by losing its ability to collect on the funds wrongfully collected and retained by Brandywine. *Wal-Mart*, 125 F.Supp.2d at 429 (likely inability to collect future monetary damage award evidences irreparable harm).

MCC is additionally being harmed by the interference of Brandywine with its right to carry on its business of collecting on accounts receivable it has purchased and realizing profits for its investors — the crux of its business. (Fazio Aff., ¶ 10.) Such harm has been recognized by Nevada courts as irreparable injury. *Sobol v. Capital Management Consultants, Inc.*, 102 Nev. 444, 446, 726 P.2d 335, 337 (1986) ("acts committed without just cause which unreasonably interfere with a business or destroy its credit or profits, may do an irreparable injury and thus authorize issuance of an injunction"); *Guion v. Terra Mktg. of Nevada, Inc.*, 90 Nev. 237, 240, 523 P.2d 847, 848 (1974).

In this case, Brandywine has appropriated and is refusing to turn over collections received on the accounts receivable purchased by MCC. Such improper actions are without just cause. MCC has performed its obligations under the Purchase Agreement. Brandywine, however, has

1 | deliberately retained payments on the accounts and impeded MCC's efforts to directly collect on the
2 | accounts.

3 | If Brandywine is permitted to continue to appropriate, convert, and otherwise impermissibly
4 | collect and use MCC's funds, MCC's right to those proceeds will likely be forever lost, and MCC
5 | will continue to be impeded in its right to carry on its business and make a profit thereon.  No
6 | adequate remedy at law exists to remedy the damages that may occur if Brandywine is not enjoined
7 | from its improper actions.

8 | Because MCC is likely to prevail on its claims and because it will suffer irreparable injury
9 | absent issuance of an injunction, the Court should enter an order providing for the injunctive relief
10 | sought against Brandywine.

### 4.    Serious Questions Exist Regarding Brandywine's Actions, and the Balance of Hardships Weighs in Favor Of MCC.

13 | In addition to a likelihood of success on the merits and an irreparable injury, serious
14 | questions exist with regard to Brandywine's conduct and the balance of hardships weighs in favor of
15 | MCC.

16 | As demonstrated in the preceding sections and as evidenced by the likelihood of success on
17 | the merits by MCC, serious questions exist regarding the propriety of Brandywine's actions and its
18 | financial viability.

19 | In addition, the balance of hardships weighs in MCC's favor.  Brandywine continues to
20 | collect on the accounts.  It is not known what Brandywine is doing with the collected funds nor how
21 | long it may remain in operation.  It is entirely possible that Brandywine may cease operating leaving
22 | MCC with no means of recovering the funds improperly collected and retained by Brandywine.
23 | Without a preliminary injunction enjoining Brandywine from continuing its unlawful conduct or
24 | preventing it from continuing to use and divert the funds it has wrongfully collected and retained,
25 | MCC may ultimately be left with no remedy.  Accordingly, the Court should enter an order
26 | providing for the injunctive relief sought against Brandywine.

27 | ///

28 | ///

## IV.    CONCLUSION

For all of the foregoing reasons, MCC Special Purpose Corporation VIII respectfully requests that this Court grant its Motion for Partial Summary Judgment against Brandywine Health Services of Mississippi, Inc. and Jeffrey A. Morse.  In the alternative to the immediate entry of a summary judgment order, MCC requests the Court enter an order granting preliminary injunctive relief to MCC, maintaining the status quo and protecting MCC's interest in the subject accounts receivable.

DATED this 14TH day of January, 2005.

Respectfully submitted,

BECKLEY SINGLETON, CHTD.

IKE LAWRENCE EPSTEIN, ESQ.
Nevada Bar No. 4594
ERIC D. HONE, ESQ.
Nevada Bar No. 8499
CRAIG J. CARLSTON, ESQ.
Nevada Bar No. 8977
BECKLEY SINGLETON, CHTD.
530 Las Vegas Boulevard South
Las Vegas, Nevada  89101
Telephone:  (702) 385-3373
Facsimile:  (702) 385-9447



## CERTIFICATE OF SERVICE

Pursuant to Fed.. R. Civ. P. 5(b), I hereby certify that service of the foregoing **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND ALTERNATIVE MOTION FOR PRELIMINARY INJUNCTION** was made this date by depositing a true copy of the same for mailing at Las Vegas, Nevada, addressed to the following:

Eric Taylor, Esq.
Stacy R. Smith, Esq.
Sarah A. Smegal, Esq.
ALVERSON, TAYLOR,
MORTENSEN & SANDERS
7401 West Charleston Boulevard
Las Vegas, Nevada 89117-1401

DATED this 4th day of January, 2005.

_____
An Employee of Beckley Singleton, Chtd.

BECKLEY
SINGLETON
ATTORNEYS AT LAW
530 LAS VEGAS BLVD SOUTH
LAS VEGAS, NEVADA 89101

# Exhibit "A"

1
### AFFIDAVIT OF THOMAS R. FAZIO IN SUPPORT OF
### PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND ALTERNATIVE
2
### MOTION FOR PRELIMINARY INJUNCTION

3  STATE OF NEW YORK        )
                            )ss.
4  COUNTY OF SUFFOLK        )

5          THOMAS R. FAZIO, being first duly sworn, deposes and says:

6          1.      I am General Counsel for MCC Special Purpose Corporation VIII, ("MCC"), plaintiff

7  in this matter. In this capacity, I have access to and knowledge of MCC's records and dealings with

8  defendants Brandywine Health Services of Mississippi, Inc. ("Brandywine"), and Jeffrey A. Morse

9  ("Morse").

10         2.      I make this affidavit under the penalty of perjury. Unless stated on information and

11 belief, I have personal knowledge of the facts and circumstances set forth in this affidavit and could

12 and would competently testify thereto in a court of law.

13         3.      MCC is a private investor-funded company that purchases uncollected medical

14 accounts receivable and health-care insurance receivables from medical providers in order to provide

15 a return to its investors. Because the factoring of the accounts receivable is a complex business,

16 providers who default on their contracts by refusing to permit MCC to collect on the purchased

17 accounts or by failing to turn over money received from those accounts, can cause serious and

18 irreparable harm to MCC, both in terms of monetary damages and in goodwill with its investors.

19         4.      On or about August 10, 2004, Brandywine and MCC entered into a Purchase

20 Agreement whereby Brandywine agreed to sell to MCC certain uncollected accounts receivable. A

21 true and correct copy of the Purchase Agreement is attached hereto as Exhibit 1.

22         5.      Brandywine sold to MCC accounts receivable with an aggregate face value of

23 $559,461.62. The parties agreed that these accounts would have a contractually agreed upon value of

24 $318,957.38. In exchange for the sale of the accounts receivable, MCC paid Brandywine

25 $245,597.17 (the agreed upon advance rate amount of $255,165.90 less an origination fee of

26 $9,568.73). (*See* Purchase Agreement, Exhibit A.)

27         6.      Brandywine accepted and retained the advance rate payment from MCC, but has failed

28 to pay MCC any of the amounts due and owing under the Purchase Agreement.

BECKLEY
SINGLETON
ATTORNEYS AT LAW

550 AS VEGAS BLVD SOUTH
LAS VEGAS, NEVADA 89101

{00168532;}                                    1

7.    Brandywine granted to MCC a lien and security interest in all accounts receivable, then existing or thereafter created (except for the accounts receivable directly sold to MCC). This security interest was perfected by filing a UCC-1 Financing Statement with the Secretary of State of Mississippi on or about August 10, 2004. A true and correct copy of the UCC-1 Financing Statement is attached hereto as Exhibit 2.

8.    On August 12, 2004, almost immediately after receiving payment of the contractually agreed upon amount of $245,597.17, Brandywine and Morse breached the Purchase Agreement and Guaranty by sending a written letter to MCC purporting to unilaterally terminate the agreement and expressly stating their intention to interfere with MCC's contractual right to collect on the purchased accounts receivable. A true and correct copy of the August 12, 2004, letter from Morse and Brandywine is attached hereto as Exhibit 3.

9.    Despite demand having been made by MCC, Brandywine and Morse have failed and refused to perform their obligations under the Purchase Agreement and the Guaranty.

10.    The actions of Brandywine and Morse have also interfered with and obstructed MCC's business and have damaged MCC's profits, thus interfering with the goodwill it has with its investors.



THOMAS R. FAZIO

SUBSCRIBED and SWORN to
before me this ___11TH___ day
of January, 2005.

_____
NOTARY PUBLIC

```
ERIC NORMAN HO
Commission # 1348557
Notary Public - California
Orange County
My Comm. Expires Mar 30, 2006
```

BECKLEY
SINGLETON
ATTORNEYS AT LAW
510 LAS VEGAS BLVD SOUTH
LAS VEGAS, NEVADA 89101

{00168532.}

2

Exhibit "1"

## PURCHASE AGREEMENT

THIS PURCHASE AGREEMENT (the "Agreement") is made and entered into as __10th__ day of __August__, 2004 by and between MCC Special Purpose Corporation VIII, (the "Buyer"), a Nevada corporation its address being 3770 Howard Hughes Parkway, Suite 301, Las Vegas, NV 89109 Medical Capital Corporation (the "Administrator"), a Nevada Corporation its office address being 2100 South State College Blvd, Anaheim, CA 92806 and Brandywine Health Services of Mississippi, Inc., aka Choctaw County Medical Center, a Mississippi Corporation, ( the "Provider" ), its Federal I.D. number being 82-0543869 and its address being 148 West Cherry St., Ackerman, MS 39735 and its telecopy number being 662-285-2516.

### RECITALS

WHEREAS, the Provider is engaged in the business of providing medical services in Mississippi.

WHEREAS, Buyer desires to purchase from the Provider, and the Provider desires to sell to Buyer from time to time, the accounts receivable of the Provider described in Exhibit A attached hereto, and with respect to purchases subsequent to the Closing Date (as defined in Section 1.3 hereof) the accounts receivable described in Schedule 1 to the applicable Purchase Supplement, (being amounts due for each individual procedure, treatment, medical service or supply coded as a line item appearing on a billing form such as the HCFA 1500 or the UB 92) (collectively the "Accounts" and individually an "Account"), on the terms and subject to the conditions hereinafter set forth; and

WHEREAS, those capitalized terms which are not defined in any other provision hereof shall have the meaning given them in Section 9 of this Agreement.

### AGREEMENT

NOW, THEREFORE, in consideration of the foregoing premises and of the mutual covenants contained herein, and other good and valuable consideration, the parties hereto agree as follows:

1.  **Agreement to Sell and Agreement to Purchase.**

    **1.1    Assets to be Conveyed.**  On the terms and subject to the conditions set forth in this Agreement, effective upon the Closing (as hereinafter defined), the Provider hereby conveys, transfers, assigns, sells and delivers to Buyer and Buyer hereby acquires, accepts and purchases from the Provider, all of the following (collectively, the "Assets"):

    (a)    the Accounts; and

    (b)    all tangible evidence of each Account, reconciliations, reports and any and all other documentation of any kind relating to such Accounts in the possession of or under the control of the Provider (collectively, the "Account Records"). Provider will, prior to closing, transmit electronically to Buyer the Account billing, in the face amount of the bill ("Billing Forms") sent to each patient and third party payor in connection with each Account, in such computer form and format as requested by Buyer.

    **1.2    Further Assurances.**  From time to time on and after the Closing (as hereinafter defined), the Provider shall immediately execute and deliver to Buyer such instruments of sale, transfer, conveyance, assignment and delivery consents, assurances, powers of attorney and other instruments as may be requested by Buyer in order to vest in Buyer all right, title and interest of the Provider in and to the Assets and otherwise in order to carry out the purpose and intent of this Agreement.

1

**1.3**    **Closing.** Each closing for the purchase and sale of the Accounts and other Assets hereunder, including, without limitation, any subsequent purchases pursuant to Section 1.4 hereof (each a "Purchase" and collectively the "Purchases") shall take place at the offices of Medical Capital Corporation, being 2100 South State College Blvd, Anaheim, CA 92806, with an initial closing at 10:00 A.M. local time, on ___8 - 10 - 04___ ,or at such other time and place as the parties hereto shall mutually agree (each a "Closing" or a "Closing Date"). The Accounts to be initially sold and purchased hereunder are as identified in Exhibit A attached hereto, and the Accounts to be sold and purchased from time to time after the initial Closing Date shall be as identified in Schedule 1 to Purchase Supplements attached hereto. In addition, Provider shall deliver to Buyer the documents set forth in Section 7.2(d) of this Agreement with respect to such additional Accounts.

**1.4**    **Additional Purchase of Accounts.** Buyer intends to acquire additional Accounts from Provider after the initial Closing Date. Provider agrees to sell to Buyer Accounts for a period of one year after the initial Closing Date. Such sales of Accounts to Buyer shall be governed by the terms of this Agreement and the Purchase Price therefor shall be calculated and paid in the manner set forth in Section 2.1 of this Agreement. The Provider agrees to sell and the Buyer intends to purchase Accounts on a weekly basis.

**1.5**    **The Reserve Account** The Administrator will establish a reserve account. This reserve account will be owned, maintained, managed, and under the control of the Administrator. During the collection process, the reserve account will be credited with the deferred purchase price of the Accounts. The Administrator may make withdrawals from the reserve account to offset any monies which the Provider owes to the Buyer, or may owe to the Buyer in the future, as a result of the Buyers' purchase of Accounts from the Provider.

(a)    The Administrator will furnish the Provider regular accounting of the reserve account. Such accounting will be delivered to the provider no later than the 15th day of each month, for the preceding monthly period, beginning no later than 90 days following the initial purchase date.

(b)    If the Provider is not in default of any provisions of the Purchase Agreement, the Administrator will pay the Provider as additional payment for the accounts, an amount equal to all funds in the reserve account exceeding 25 per cent of the outstanding balance of the adjusted rate amount of the Accounts. This payment will be made no later than the 15th day of each month, for the preceding monthly period, beginning no later than 90 days following the initial purchase date.

(c)    At such time as all additional purchases have been completed, all accounts collected, and the Provider is not in default of any provision of the purchase agreement, any amounts remaining in the reserve account will be paid to the Provider.

(d)    Any default of Section 5.5 B, or any other section(s) herein this Agreement will result in an immediate surrender of all funds in the reserve account and applied to the benefit of the Administrator.

**2.**    **Consideration to be Paid by Buyer.**

**2.1**    **Purchase Price for the Assets.** Subject to Section 2.2 below, the purchase price for each Purchase (the "Purchase Price") shall be calculated and paid as follows:

(a)    On the Closing Date for each Purchase, a percentage (the "Advance Rate Amount" ) equal to of the Adjusted Value of each of the Accounts included in such Purchase as set forth in Exhibit A hereto for the initial Purchase and in Schedule 1 to the applicable Purchase Supplement for subsequent Purchases.

MCC00002

(b)     In addition to the Advance Rate Amount payable as of the Closing Date for each Purchase, subject to Sections 2.1(c), (d) and (e) hereof, Buyer shall deposit a deferred purchase price in the reserve account (the "Deferred Purchase Price") with respect to each of the Accounts included in any related Purchase in an amount equal to a percentage of the Adjusted Value of such Account, as set forth in Exhibit A hereto for the initial Purchase and in Schedule 1 to the applicable Purchase Supplement for subsequent Purchases.

(c)     The Deferred Purchase Price with respect to an Account shall be deposited in the reserve account by Buyer after allocations to the reserve account and on the earlier of (i) the date on which Buyer shall have received aggregate collections in respect of all Accounts included in any Purchase hereunder in excess of an amount equal to the aggregate Adjusted Value of such Accounts less the aggregate amount of the Deferred Purchase Price for such Accounts or (ii) each of the Accounts included in the related Purchase has been collected in full by Buyer or otherwise settled by Buyer with the related Payor in full conformity with Provider's covenants, representations and warranties set forth herein. Buyer shall remit to the reserve account on the 15th day of each month after the month in which the Deferred Purchase Price becomes payable (the "Payment Date") in payment of such Deferred Purchase Price, the portion of such excess amount, if any, collected during the calendar month preceding such Payment Date until the earlier of (i) the date such Deferred Purchase Price shall have been paid in full and (ii) the date all such related Accounts have been collected by Buyer in full or written-off Buyer's books as uncollectible. Notwithstanding the above, Buyer, may, at its option, pay the Deferred Purchase Price by transferring and assigning the Accounts with respect to which the Deferred Purchase Price is payable to the Provider, in which case the Provider shall bear all costs and risks of collection of such Accounts. Buyer shall automatically deduct from the Deferred Purchase Price otherwise payable with respect to the Accounts included in any Purchase, the Adjusted Value of any Account included in any Purchase on the date it becomes classified, by Buyer, as uncollectible and any other amounts payable by Provider to Buyer hereunder.

(d)     Notwithstanding the provisions set forth in Sections 2.1(b) and 2.1(c) hereof, in the event Buyer determines that a breach of any covenant, representation or warranty of the Provider hereunder has occurred with respect to an Account (an "Ineligible Account") and the Provider fails to substitute such Ineligible Account with a "Substitute Account" (as defined in and pursuant to Section 2.2 hereof), or the Provider fails to pay the deficiency amounts payable to Buyer pursuant to Section 2.2 hereof, then the Buyer shall offset the amount of the Deferred Purchase Price otherwise payable on the Accounts to the Provider by the amount of the related shortfall in the collections of the Adjusted Value on such Ineligible Accounts, and by all other amounts payable to Buyer hereunder.

(e)     Notwithstanding the provisions set forth in Sections 2.1(b) and 2.1(c) hereof, in the event the Buyer determines that the Provider has breached any of its representations, warranties or covenants set forth herein, until Provider has cured such breach to Buyer's satisfaction, Buyer shall have no obligation to apply to the reserve account the Deferred Purchase Price.

(f)     In the event that Buyer determines Provider has breached any of its representations, warranties or covenants contained in this Agreement, the Provider shall, upon demand by Buyer, repurchase from Buyer all of the Accounts for a price equal to the Adjusted Face Value of such Accounts, less collections actually received by Buyer on such Accounts, plus all other amounts payable to Buyer hereunder.

(g)     Buyer will send on or before the 15th day of each month a collection activity report, as prepared by its collection agent, with regard to the Accounts for the preceding month's collection activities which shall reflect the collection status of the Accounts, a status report on the amount of the accrued reserve account and any adjustments made thereto on account of Ineligible Accounts.

## 2.2     Repurchase Obligation; Substitution of Accounts; Security Interest; Purchase Price Adjustment.

(a)     If (i) any recapture or set-off by any person, entity or governmental payor against any Account occurs after the Closing Date, or (ii) Provider breaches any representation or warranty or covenant with respect to

3

any Account set forth in this Agreement or in any Exhibit hereto, or in any Purchase Supplement or any document delivered in connection herewith (A) the Provider shall give written notice of such dispute, denial, refusal, notice of set-off or recapture or other claim affecting the Account or Accounts or breach of such representation, warranty or covenant to the Buyer along with copies of any correspondence in connection therewith, immediately, but in no event later than three (3) days following the date Provider learns of the dispute, denial, refusal, notice of set-off or recapture or other claim affecting the Accounts or a breach of such representation or warranty or covenant and (B) such Account, together with the Account Records relating thereto (collectively, the "Excluded Assets") shall, immediately upon demand by Buyer, be repurchased by Provider at a repurchase price equal to the Gross Face Value of such Accounts less any amount actually collected by Buyer with respect to such Excluded Assets or, at Buyer's option, substituted with another Eligible Account (a "Substitute Account") as provided herein. If any Excluded Assets are required to be substituted pursuant to this Section 2.2, additional current (i.e., not older than 30 days from the Billing Date) accounts receivable (collectively, the "Substitute Accounts"), together with all Account Records relating to such additional accounts receivable (collectively, the "Substitute Assets"), shall be substituted promptly by the Provider for such Excluded Assets until the Gross Face Value and Adjusted Value of such Substitute Assets is at least equal to the Gross Face Value and Adjusted Value of the Excluded Assets; provided, however, that all Substitute Assets must be approved in writing by the Buyer prior to the substitution and acceptance of such Assets by the Buyer hereunder. Any proposed Substitute Assets not approved by the Buyer shall be retained by the Provider, and the Provider shall offer to the Buyer additional proposed Substitute Assets until the Gross Face Value and Adjusted Value of the Substitute Assets accepted by the Buyer is at least equal to the Gross Face Value and Adjusted Value of the Excluded Assets.

(b)     Should the amount collected (within 120 days of the Billing Date) on any Account (including Substitute Assets) purchased by Buyer be less than the amount of its Adjusted Value, then (whether or not Provider has delivered Substitute Accounts for such delinquent Accounts), unless such nonpayment is due to the bankruptcy, insolvency or financial inability of the Payor to pay such Account as demonstrated by the Provider to the satisfaction of Buyer, Provider shall remit to Buyer the amount of such difference between the Adjusted Value of the Account and the amount actually collected on such Account by Buyer as the repurchase price of such Accounts. The amount of said repurchase price shall be paid within four (4) business days of Provider's receipt of notice from Purchaser notifying Provider of said deficiency. The amount of said repurchase price shall be paid by delivery of a certified or bank check or, at Buyer's option, by the delivery of the repurchase price in Substitute Assets approved by the Buyer. In addition, in the event that any Accounts are not paid in full within 120 days of their respective Billing Dates and the Provider fails to repurchase such Accounts, the Buyer shall deduct, from the Advance Rate Amount and the Deferred Purchase Price otherwise payable for all Accounts with respect to any Purchase, an amount equal to the Adjusted Value of such uncollected Account less the Deferred Purchase Price thereof.

(c)     The Provider shall pay or reimburse Buyer, upon demand, for all costs and expenses paid or incurred by Buyer in connection with its review and approval of Substitute Assets pursuant to this Section 2.2.

(d)     It is the express intent of the parties that the transfer of the Accounts by the Provider to Buyer hereunder and pursuant to any Purchase Supplement be treated, and the parties hereby agree to so treat such transfers, as a sale of such Accounts, and not as a secured financing, between the Provider and Buyer for tax, accounting and all other purposes. However, in the alternative, in the event that any court of competent jurisdiction over the matter should determine that any Purchase is deemed to be a financing and not a true sale notwithstanding the express intent of the parties hereto that it be deemed a true sale, the Provider shall be obligated to pay Buyer an amount equal to the Adjusted Value of each Account on the 120th day following the respective date or service (i.e. the date the services or product was rendered).of such Account and the Provider hereby expressly grants to the Buyer a first lien upon and perfected security interest in all of the Accounts and other Assets described in Exhibit A hereto and in Schedule 1 to each Purchase Supplement, both presently and hereafter acquired by purchase or as Substitute Accounts, including all proceeds therefrom, and all funds due to the Provider from any other source whatsoever, relating to such Accounts or Substitute Accounts to secure performance of the Provider's obligations pursuant to this Agreement, including without limitation Provider's obligation to provide Substitute Assets and pay Buyer cash in lieu of Substitute Assets as provided in the first paragraph of this Section 2.2. Provider shall execute

4

such financing statements and other documentation as Buyer may request from time to time in order to perfect and protect Buyer's security interest in the Accounts and other Assets.

(e)       All Substitute Accounts and Substitute Assets approved by the Buyer in accordance with this Section 2.2 shall, without further action by the parties hereto, be deemed "Accounts" and "Assets", respectively and as such shall be subject to all of the terms and conditions of this Agreement including, without limitation, all Provider's representations, warranties and covenants and Buyer's security interest therein. Notwithstanding anything herein to the contrary, if, for any reason, the Adjusted Value of the Substitute Assets is not at least equal to the Adjusted Value of the Excluded Assets, the Purchase Price shall be subject to post-Closing downward adjustment to compensate for such discrepancy. The amount of such adjustment shall be paid by the Provider to the Buyer by delivery of a certified or bank check or other form of cash equivalent requested by the Buyer within five (5) business days following such request.

2.3       **Payment of Purchase Price**.  On the Closing Date for each Purchase, Buyer shall pay to the Provider the Advance Rate Amount by wire transfer in immediately available funds into an account designated by Provider in writing or by certified check.

2.4       **Additional Security**.  As additional security for the Provider's performance of its representations, warranties, covenants and agreements set forth in this Agreement, the Provider hereby grants to the Buyer a first lien upon and perfected security interest in all accounts receivable of the Provider (other than the Accounts) both presently existing and hereafter created, including all proceeds therefrom, and all funds due to the Provider from any other source whatsoever relating to such accounts. Provider shall execute such financing statements and other documentation as Buyer may request from time to time in order to perfect and protect Buyer's security interest in such accounts. Upon the breach by Provider of any of its representations, warranties or covenants hereunder as determined by Buyer, Provider hereby (I) authorizes Buyer to instruct the Payors to make payment on such accounts directly to the Buyer and (ii) consents to the appointment of a receiver to take control of and to collect and liquidate for the benefit of Buyer all collateral pledged hereunder.

3.       **Liabilities Not Assumed by Buyer**.  Provider covenants, represents and warrants that the Buyer shall not be deemed by anything contained in this Agreement to have assumed liabilities relating to, or arising out of, the Assets, including, without limitation, the following (hereinafter collectively referred to as "Retained Liabilities"):

(a)       Any liability of the Provider to any person or entity, the existence of which constitutes a breach of any covenant, agreement, representation or warranty of the Provider contained in this Agreement;

(b)       Any liability of the Provider for any federal, state, municipal, local or foreign taxes, assessments, additions to tax, interest, penalties, deficiencies, duties, fees and other government charges or impositions of each and every kind or description, whether measured by properties, assets, wages, payroll, purchases, value added, payments, sales, use, business, capital stock, surplus or income with respect to ownership of the Assets up to and including the related Closing Date with respect to such Assets;

(c)       Any liability or obligation (contingent or otherwise) of the Provider to any person or entity arising out of any litigation, claim, arbitration or other proceeding;

(d)       Any liabilities or obligations of any kind whatsoever relating to any action or inaction by any person or entity, including, without limitation, any of the Provider's officers, directors, shareholders, employees, agents, representatives or independent contractors (collectively, "Agents"), relating in any way to the services rendered by any of them in connection with the Accounts or the servicing of any of the Accounts in the case of such servicing up to and including the Closing Date;

5

MCC00005

(e)   Any liability or obligation (contingent or otherwise) of the Provider arising out of defects in or mislabeling of, or damages to persons or property arising out of defects or mislabeling of, products (including, without limitation, prescription medications) manufactured, sold, or prescribed by the Provider in connection with any of the Accounts;

(f)   Any liability or obligation of the Provider to compensate any person or entity, including, without limitation, any agent, licensor, supplier, distributor or customer of the Provider, in respect of any services rendered or products manufactured, sold or prescribed in connection with the Accounts; and

(g)   Any recapture, set-off, or other claim made by any third party payor against the Accounts.

**4.**   **Representations and Warranties of the Provider**.  The Provider represents and warrants to Buyer as follows:

**4.1**   **Organization and Good Standing**.  The Provider is a corporation or a professional association duly organized, validly existing and in good standing under the laws of the state of its incorporation or organization, with full power to carry on its business as it is now operated and to own the Assets and convey good and marketable title and ownership of the Assets to Buyer. The Provider is qualified to do business and is in good standing in each jurisdiction in which the nature of its business or the character of its properties makes such qualification necessary.

**4.2**   **Proper Authority**.  The Provider has all requisite power and authority to enter into this Agreement and to consummate the transactions contemplated hereby. This Agreement and all other Agreements and instruments to be executed by the Provider in connection herewith have been (or upon execution will have been) duly executed and delivered by the Provider, have been effectively authorized by all necessary action, corporate or otherwise, and constitute (or upon execution will constitute) legal, valid and binding obligations of the Provider in accordance with their respective terms.

**4.3**   **Ownership of Assets**.  The Provider is the lawful owner of each of the Assets, and all Assets are free and clear of all liens, mortgages, pledges, security interests, restrictions, prior assignments, encumbrances and claims of any kind or nature whatsoever (collectively, "Liens"). The execution and delivery to Buyer of this Agreement and, if applicable, the instruments of transfer of ownership contemplated by this Agreement will vest good and marketable title to the Assets in Buyer free and clear of all Liens and shall constitute a true sale of the Accounts under applicable law (including for tax and accounting purposes) and not a secured financing. Without limiting the generality of the forgoing, none of the Assets is subject to any contract, agreement or understanding (other than this Agreement), whether oral or written, or any indenture or other instrument to which the Provider is a party or by which it is bound (collectively, "Contracts") which subjects the Assets to any Lien or conveyance of any interest therein.

**4.4**   **Agreement Not In Breach of Other Instruments**.  The execution and delivery of this Agreement by the Provider and the consummation of the transactions contemplated hereby will not result in a breach of any of the terms and provisions of, or constitute a default under, or conflict with, any Contract, the Articles or Certificate of Incorporation or Bylaws of the Provider, any judgment, decree, order or award of any court, governmental body or arbitrator or any federal, state, municipal, local or foreign laws, statute, ordinance, rule or regulation (collectively, "Laws") applicable to the Provider.

**4.5**   **Litigation**.  There are no claims, disputes, actions, proceedings or investigations of any nature pending or, to the best knowledge of the Provider, threatened, against or involving the Provider or any of its Agents that relate in any way to any of the Assets or to the services rendered in connection therewith (the "Services"). Further, there are no injunctions, writs, restraining orders or other orders of any nature against Provider that adversely affect Provider's performance of the agreements and transactions contemplated in this Agreement, and there are no proceedings or investigations pending or threatened which adversely affect the payment or enforceability of the Accounts.

6

MCC00006

**4.6** **Regulatory Approvals**. All consents, approvals, authorizations and other requirements prescribed by any law, rule or regulation which must be obtained or satisfied by the Provider and which are necessary for the execution, delivery and performance by the Provider of this Agreement, the documents to be executed and delivered by the Provider in connection herewith and for the rendering of the Services by the Provider have been obtained and satisfied.

**4.7** **Compliance With Law**. With respect to the Assets and the Services, neither the Provider nor any of its agents has violated, and on the date hereof does not violate, in any respect, any law, rule or regulation. Neither the Provider nor any of its agents has received any notice of any such violation.

(a)      The Provider shall  maintain compliance, in the context of this Purchase Agreement,  with the laws governing the sale and assignment of Medicare and Medicaid claims under the Medicare program pursuant to 42 U.S.C. &1395 et seq., and regulations adopted under the authority thereof and  the Medicaid program adopted by any state pursuant to 42 U.S.C. &1396 et seq., and regulations adopted under the authority thereof, and every intermediary, carrier and administrator of any such programs.

**4.8** **Disclosure**. The information provided and to be provided by the Provider to the Buyer under or in connection with this Agreement, each Purchase Supplement and in any Exhibit or Schedule hereto and thereto, or in any other writing hereto does not and will not contain any untrue statement of a material fact or omits or will omit to state a material fact required to be stated herein or therein or necessary to make the statements and facts contained herein or therein, in light of the circumstances in which they are made not false or misleading.  Copies of all documents heretofore or hereafter delivered or made available to Buyer pursuant hereto were or will be complete and accurate records of such documents.

**4.9** **No Prior Collections on Accounts**. No monies have been collected to date in respect of any Account by or on behalf of the Provider or any other person or entity, or, if any monies have been collected with respect to the Accounts, such funds have been turned over to Buyer. The Provider, after due investigation, knows of no reason why each Account should not be collected in full within 120 days of its Billing Date in the ordinary course of business by or on behalf of Buyer or its assignee. No other person or entity participated in the rendering of such Services or is entitled to any payment whatsoever in respect of such Services. All Services were rendered in full in the ordinary course of business, in accordance with the prevailing standards of the practice of medicine in the County in which the Provider operates, and the amounts charged for such Services as set forth in the Accounts represent the standard amounts billed by the Provider for the same or similar services in the ordinary course of business at the date on which such Services were rendered. All Services were rendered and all paperwork in respect of the Accounts was completed in accordance with all applicable Laws, including, without limitation and to the extent applicable, all Laws governing the Medicare programs and all rules of the relevant insurance companies who are the respective Payors of the Accounts. Each Account is the legal, valid and binding obligation of the respective Payor enforceable in accordance with its terms and is not subject to any dispute, offset, counterclaim or encumbrance of any kind.

**4.10** **Sale of Accounts Conveys Valid Enforceable Claims Against Payors**. Each and every step has been taken by Provider pursuant to the terms of this Agreement or otherwise to assign to Buyer, Provider's rights to collect and enforce payment of the Account payable by the Payor and the assignment thereof shall transfer fully enforceable rights to Buyer against each Payor of the respective Account to collect the full amount of each of the Accounts from such Payor.  Each Account is in accordance with and does not contravene any laws, rules or regulations applicable thereto, or contract between the Provider and the Payor applicable thereto, and no party to an Account or related contract is in violation of any such law, rule or regulation.

**4.11** **Solvency**. Provider is not insolvent and will not be rendered insolvent as a result of the sale and transfer of the Assets pursuant to this Agreement or as a result of the transaction contemplated by this Agreement. For purposes hereof, the Provider's tangible assets are in excess of the total amount of its liabilities; (i) including for

MCC00007

purposes of this definition all liabilities, whether or not reflected on a balance sheet prepared in accordance with generally accepted accounting principles, and whether direct or indirect, fixed or contingent, secured or unsecured, disputed or undisputed; (ii) Provider is able to pay its debts and obligations in the ordinary course as they mature; and (iii) Provider has sufficient funding to carry on its business as presently conducted by it.

**4.12    Representations, Warranties and Covenants of Provider Relating to the Purchase of Accounts from Provider.**  In addition to the other representations, warranties and covenants of Provider set forth herein, Provider does hereby represent, warrant, and covenant with regard to each of the Accounts identified in Exhibit A attached hereto and in Schedule 1 to any Purchase Supplement delivered pursuant to Section 1.4 hereof that, with regard to each of the Accounts identified therein:

(a)    the services stated in the Accounts were actually provided;

(b)    the health care fees charged are customary, reasonable and are payable at such rate under the terms of the related patient's health care insurance coverage with an approved Payor;

(c)    the private medical insurance coverage by the responsible Payor was effective at the time of treatment;

(d)    the Provider has pre-verified insurance coverage by the Payor prior to admittance of a patient;

(e)    the claim for payment has been submitted to the responsible Payor within the last 90 days and has been acknowledged by such Payor;

(f)    all supporting documentation necessary to verify a claim have been submitted to the Payor by the Provider;

(g)    that the contracted patient co-payment amounts on the Accounts and their related Adjusted Value are as stated in Exhibit A or Schedule 1 to the Purchase Supplement to this Agreement; and

(h)    the Provider acknowledges that in the event of insolvency of the Payor of any of the Accounts hereunder, that the Provider hereby covenants and agrees to repurchase such Accounts, up to a maximum of ten percent (10%) by Adjusted Value of the subject Accounts, pursuant to and in full compliance with Section 2.2 of this Purchase Agreement.

(i)    the accounts are free of fraud and are considered collectible from third parties, other than the patient or their guarantor.

(j)    the accounts contain accurate billing and are free of errors.

**4.13    Sale of Accounts to be Reflected on Provider's Books and Records.**  Provider will reflect on all of its books, records, tax filings and financial statements, and in all its dealings with the Payors of such Accounts, that it has sold the Accounts and related Assets to Buyer and shall treat and characterize all Purchases as sales of the Accounts and related Assets for accounting and tax purposes. The Provider hereby affirms that it has valid business reasons for selling the Accounts to the Buyer as contemplated by this Agreement rather than obtaining a loan with the Accounts being utilized as collateral therefor.

**4.14    Receivables are Accounts.**  Each of the Accounts complies with the definition of "Eligible Account" as set forth in Section 9.1 hereof.

**4.15    Provider's Tax Returns.**  Provider has filed on a timely basis all federal, state and local tax returns required in the conduct of its operations.

8

MCC00008

4.16   **Provider's Pension and Profit Sharing Plans**.  All Provider (and any of Provider's consolidated subsidiaries) pension or profit sharing plans have been fully funded in accordance with Provider's applicable obligations.

4.17   **Provider's Principal Place of Business**.  Provider's principal place of business and chief executive office are located at the address set forth in the first paragraph of this Agreement, and have been located at such address for the past four months.  Except as otherwise disclosed to Buyer in writing on or prior to the date of this Agreement, Provider conducts business only in the County set forth in the recitals to this Agreement.

4.18   **Identity of Provider**.  The full and correct legal name of the Provider is as set forth in the first paragraph of this Agreement, Provider has not changed its name in the last six years, and Provider does not have any trade names, fictitious names, assumed names or "doing business as" names except as have previously been disclosed in writing to the Buyer.

4.19   **No Adverse Change**.  No event has occurred which adversely affects Provider's operations, including its ability to perform the transactions contemplated by this Agreement.

4.20   **Financing Statements**.  There are no financing statements now on file in any public office governing any property of any kind, real or personal, in which Provider is named in or has signed as the debtor, except the financing statement or statements filed or to be filed in respect of this Agreement or those statements now on file that have been disclosed in writing by Provider to Buyer.  Provider will not execute any financing statement in favor of any other person or entity, excepting Buyer, for the term of this Agreement.

4.21   **No Set-Offs**.  There are no set-offs, allowances, discounts, deductions, counterclaims, or disputes with respect to any Account, either at the time it is accepted by Buyer for purchase or any time prior to the date it is to be paid.  "Dispute," as used in the last preceding sentence, shall mean any claim by Payor against Provider, of any kind whatsoever, valid or invalid, that is asserted by the Payor as a basis for refusing to pay an Account either in whole or in part.

4.22   **No Change of Address**.  Provider shall not change its mailing address, chief executive office, principal place of business or place where such records are maintained without 30 days prior written notice to Buyer.

4.23   **No Other Pledges**.  Provider will not transfer, pledge or give a security interest in any of the Accounts to anyone other than Buyer.

5.   **Certain Understandings and Agreements of the Parties**.

5.1   **Access and Cooperation**.  From and after the date hereof (i) Buyer  and any other authorized agents and appointed representatives of Buyer including its Servicer shall have reasonable access during normal business hours to all Account records and any and all other documentation relating to the Accounts, including, without limitation, patient records and information, and (ii) the Provider shall promptly furnish or cause to be furnished to Buyer all information (including turning over originals or copies of such information) requested by Buyer or any of its agents relating to the Assets.  Upon a breach by Provider of any of its representations, warranties or covenants hereunder, all costs, fees and expenses incurred by Buyer in conducting any such review or audit shall be paid by Provider to Buyer, upon demand.  After the Closing Date for each Purchase the Provider shall continue to cooperate fully with Buyer and Buyer's agents in any and all matters related to any Assets, including, without limitation, matters relating to the collection of any Account.  It is further understood and agreed that Buyer and its agents shall have the right at any time to communicate with and seek the assistance of Payors, patients and relatives or guardians of patients of the Provider for the purpose of facilitating the servicing and collection of the Accounts.

9

MCC00009

5.2     **Handling of Accounts**. From and after the date hereof the Assets shall be handled by or on behalf of the Provider in the ordinary course of the business, and no act shall be done or omitted to be done by or on behalf of the Provider, which act or omission could jeopardize collection of payment on any Account by Buyer; provided, however, that no Accounts shall re-billed by or on behalf of the Provider or any other person or entity without the prior written consent of Buyer and the Provider shall make all appropriate entries in its computer or other billing system for billing or re-billing of Accounts which require that all payments be forwarded directly from the Payors of such Accounts to Buyer's Lock-Box Account described in Section 5.5(b) hereof. Provider (or its agents) shall be responsible for billing, re-billing, and collecting all amounts with respect to the Accounts following the Closing Date for a Purchase related thereto and Buyer shall refer all inquiries concerning the Accounts from the Buyer of such Accounts to Provider.

5.3     **Future Encumbrances**. It is understood and agreed that the Provider shall not, at any time, for any reason or under any circumstances, cause or permit any of the Assets to become subject to any Liens other than the lien of Buyer or its assigns in the Accounts. It is further understood and agreed that, as of the Closing Date for each Purchase, the Provider shall have no right, title or interest in or to the Assets related thereto, and shall not, at any time, for any reason or under any circumstances, hold itself out to third parties as having any right, title or interest in or to such Assets. Without limiting the generality of the foregoing, the Provider shall not, at any time, for any reason or under any circumstances, bill any person or entity, including, without limitation, any governmental agency, in connection with the collection, in whole or in part, of any Account, except pursuant to the written request of the Buyer.

5.4     **Cooperation in Litigation**. Provider shall fully cooperate with Buyer in the defense or prosecution of any litigation or proceeding which may be instituted hereafter against Buyer or Buyer's assigns on account of enforcement of Buyer's ownership of the Assets and the enforcement of payment from the related Payor thereof, and Provider shall indemnify Buyer or their respective agents or assigns for any loss or expense including their reasonable attorneys fees incurred by such parties relating to or arising out of the Provider's billing, administration or handling of the Assets prior to or after the Closing Date related thereto.

5.5     **Power of Attorney and Pay-Over of Receivables**.

(a)     The Provider hereby authorizes Buyer and its collection agent to open any and all mail or other correspondence in respect of any of the Assets addressed to the Provider or to any agent of the Provider (if delivered to Buyer if received on or after the Closing Date for the related Purchase thereof), and hereby grants to Buyer and its collection agent a power of attorney which is irrevocable and coupled with an interest to do any and all of the following:

(i)     to endorse and cash any checks or instruments in respect of any of the Assets ("Funds") made payable or endorsed to the Provider or its order, whether received by Buyer or received by any other party and delivered over to Buyer pursuant to Section 5.5(b) below;

(ii)     receive, open and dispose of any mail addressed to Provider and put Buyer's address on any statements mailed to Payors;

(iii)     pay, settle, compromise, prosecute or defend any action, claim, conditional waiver and release, or proceeding relating to Accounts;

(iv)     upon the occurrence of a default, notify in the name of Provider the U.S. Post Office to change the address for delivery of mail addressed to Provider to such address as Buyer may designate. Buyer shall turn over to Provider all such mail not relating to the Accounts;

10

MCC00010

(v)    execute and file on behalf of Provider any financing statement deemed necessary or appropriate by Buyer to protect its interest in and to the Accounts or Assets, or under any provision of this Agreement; and

(vi)    to do all things necessary and proper in order to carry out this Agreement.

(b)    The Provider agrees that it will (i) hold in trust for the sole and exclusive benefit of Buyer, (ii) segregate from other funds of Provider, (iii) forward within one business day of receipt thereof to the lock box account of the Buyer maintained by it with City National Bank (the "Lock Box Account") and (iv) cause its agents to forward immediately to Buyer's Lock Box Account at the address stated herein, any Funds received by the Provider or its agents after the date hereof in payment or partial payment of any Accounts (including any Medicare payments with regard to Medicare Accounts, if any, which the Provider will continue to receive notwithstanding their sale and assignment to Buyer). The Provider further agrees that, at Buyer's or its collection agent's request, the Provider shall render to such party a full and complete accounting of all Funds received in payment or partial payment of any Accounts by or on behalf of the Provider or any other person or entity other than Buyer, of which the Provider, after due investigation, is aware. Unless otherwise notified in writing by Buyer, Buyer's Lock Box Account is:

> **Brandywine Health Services of Mississippi, aka Choctaw County Medical Center**
> **P.O. Box 54297**
> **Los Angeles, CA 90051-0297**

With each remittance of Funds to the Lock Box Account, the Provider shall include a report identifying the related Account and the related Payor.

(c)    Buyer and Provider each acknowledge that the Payor(s) of the Accounts may in the normal course of business prior to receiving official notification, by the Buyer's Servicer (Medical Tracking Services, Inc.), of Buyer's purchase of the Accounts, forward to the Provider payment or partial payment on the Accounts.

(d)    Buyer and Provider also each acknowledge that the Payor(s) of the Accounts may inadvertently, even after receiving official notification of Buyer's purchase of the Accounts, forward to the Provider payment or partial payment on the Accounts. Provider agrees to provide Buyer with a daily accounting of all Funds received on all accounts receivable of Provider including the Accounts, during the period commencing the date of the execution of this Agreement and to forward all payments received to the buyers lock box within one day following receipt of such payments.

(e)    Provider agrees that in connection with the purchase of the Accounts by Buyer, the Provider shall indicate in its computer files that the Accounts have been sold to the Buyer and will be identified by account number, patient name, Payor name and the unpaid balance of each Account as of such date.

(f)    Provider shall cause in house to continue to bill and service all Accounts in accordance with procedures outlined in the Servicing Contract and as follows:

(i)    Payors are initially billed by electronic submission;

(ii)    Within 60 days, either the payment or EOB (Explanation of Benefits) status is received on the Accounts. Those accounts not paid, or where there is no EOB status report within 60 days, will be rebilled by in-house. If Provider/ billing party receives a status report on an account requesting additional information, Provider will provide such information immediately. Subsequently, if an Account is not paid or status for claim is not received within an additional thirty day period, the Account will be billed by in-house a final time;

(iii)    During the billing and rebilling period, Provider will provide Buyer with a weekly status report on all Accounts outstanding; and

11

MCC00011

(iv)    All bills shall indicate conspicuously on their face and in BOX 33 of HCFA 1500 forms that the Accounts represented thereby have been transferred to Buyer and should be paid directly to the Buyer's Lock Box Account.

5.6    **Confidentiality**.  The Provider hereby covenants and agrees that it shall not disclose any information or materials communicated to or obtained by it with respect to any of the Accounts, whether or not that information is or has been directly or indirectly communicated or obtained, including, without limitation, the terms of this Agreement (including the exhibits and any schedules hereto) (the "Confidential Materials"), to any third party, unless specifically authorized in writing by Buyer to do so; provided, however, that the Provider may disclose certain Confidential Materials to its officers, directors and employees as is reasonably necessary for compliance with the terms of this Agreement.  If Buyer gives the Provider written authorization to make any disclosures of Confidential Materials, the Provider shall do so only within the limits and to the extent of that authorization. Furthermore, the Provider shall take all actions necessary to prevent disclosure of any Confidential Materials to any third party. In the event that the Provider, or anyone whom the Provider supplies any information contained in such Confidential Materials under the terms of a subpoena, order, civil investigation demand or similar process issued by a court of competent jurisdiction or by a governmental body, the Provider agrees to (a) notify Buyer immediately of the existence, terms and circumstances surrounding such request, (b) consult with Buyer on the advisability of taking legally available steps to resist or narrow such request, and (c) if disclosure of such information is required, furnish only that portion of the Confidential Materials which, in the opinion of the disclosing party's counsel, such disclosing party is legally compelled to disclose and advise Buyer as far in advance of such disclosure as is possible so that Buyer may seek an appropriate protective order or other reliable assurance that confidential treatment will be accorded such Confidential Materials.  Without limiting the generality of the foregoing, the Provider shall not oppose actions by Buyer or Medical Capital Corporation to obtain an appropriate protective order or other reliable assurance that confidential treatment would be accorded such Confidential Materials.

5.7    **No Proceedings**.  Provider hereby agrees that it will not institute against Buyer or join any other person or entity in instituting against Buyer, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding, or other proceeding under any federal or state bankruptcy or similar law.

6.    **Indemnification and Claims**.

6.1    **Indemnification by the Provider**.  The Provider shall forthwith on demand indemnify and hold harmless Buyer and its officers, directors, shareholders, assigns and agents (each an "Indemnified Party") from and against any and all claims, losses, damages, liabilities and expenses (including, without limitation, settlement costs and any legal, accounting and other expenses for enforcing Buyer's rights and remedies hereunder, or for investigating, prosecuting or defending any actions or threatened actions) awarded or incurred by any of them arising out of or relating to this Agreement or the transactions contemplated hereby or the use of proceeds therefrom, together with interest on cash disbursements in connection therewith at the rate of eighteen percent (18%) per annum from the date cash disbursements were made or incurred by any Indemnified Party until paid in full by the Provider, including without limitation relating to each and all of the following:

(a)    Any breach or alleged of any representation or warranty made by the Provider in this Agreement or any Exhibit to this Agreement, in any Purchase Supplement or in any document delivered in connection herewith;

(b)    Any breach or alleged breach of any covenant, agreement or obligation of the Provider contained in this Agreement, any Purchase Supplement, any Exhibit to this Agreement or document provided in connection herewith, or any other instrument contemplated by this Agreement;

12

MCC00012

(c)     Any misrepresentation or alleged misrepresentation contained in any statement or certificate furnished by the Provider pursuant to this Agreement, or any Purchase Supplement or in connection with the transactions contemplated by this Agreement;

(d)     Any Retained Liabilities or other claims against, or liabilities or obligations of, the Provider not specifically assumed by Buyer pursuant to this Agreement; and

(e)     The failure to obtain the protections afforded by compliance with the notification requirements of the Bulk Sales Laws in force in the jurisdictions contemplated by this Agreement.

6.2     **Claims for Indemnification**.  Whenever any claim shall arise for indemnification hereunder, the Buyer shall promptly notify Provider of the claim and, when known, the facts constituting the basis for such claim. In the event of any claim for indemnification hereunder resulting from or in connection with any claim or legal proceedings by a third party, the notice to the Provider shall specify, if known, the amount or an estimate of the amount of the liability arising therefrom.  The Buyer shall not settle or compromise any claim by a third party for which it is entitled to indemnification hereunder, without the prior written consent of the Provider (which shall not be unreasonably withheld) unless the Provider shall have failed to pay indemnification obligations as they accrue or in the event that suit shall have been instituted against it and the indemnifying party shall not have taken control of such suit after notification thereof as provided in Section 6.3 of this Agreement.

6.3     **Defense by Indemnifying Party**.  In connection with any claim giving rise to indemnity hereunder resulting from or arising out of any claim or legal proceeding by a person who is not a party to this Agreement against the Buyer, the Provider at its sole cost and expense may, upon written notice to the Buyer, assume the defense of any such claim or legal proceeding if it acknowledges to the Buyer in writing its obligations to indemnify the Buyer or any other Indemnified Party with respect to all elements of such claim.  The Buyer shall be entitled to participate in the defense of any such action, with its counsel and at its own expense.  If the Provider does not assume the defense of any such claim or litigation resulting therefrom, (a) the Buyer or such Indemnified Party, as the case may be, may defend against such claim or litigation, in such manner as it may deem appropriate, including but not limited to, settling such claim or litigation, after giving notice of the same to the Provider, on such terms as the Buyer or such Indemnified Party, as the case may be, may deem appropriate, and (b) the Provider shall be entitled to participate in (but not control) the defense of such action, with its counsel and at its own expense.  If the Buyer or such Indemnified Party defended such third party claim or the amount or nature of any such settlement, the Provider shall have the burden to prove by a preponderance of the evidence that the Buyer did not defend or settle such third party claim in a reasonably prudent manner.

6.4     **Manner of Indemnification**.  All indemnification hereunder by the Provider shall be effected by payment of cash or delivery of a certified or official bank check in the amount of the indemnification liability and shall be payable upon demand by the Indemnified Party.

7.     **Conditions to Closing**.

7.1     **Conditions to Obligations of Each Party**.  The obligation of each party hereto to consummate each Purchase contemplated hereby shall be subject to the fulfillment, at or prior to the Closing Date for such Purchase, of the following conditions:

(a)     **No Action or Proceedings**.  No claim, action, suit, investigation, or other proceeding shall be pending or threatened before any court or governmental agency which presents a substantial risk of the restraint or prohibition of the transactions contemplated by this Agreement or the obtaining of material damages or other relief in connection therewith.

13

MCC00013

(b)    **Compliance with Law.**    There shall have been obtained all permits, approvals, and consents of all governmental bodies or agencies which counsel for either party hereto may reasonably deem necessary or appropriate so that consummation of the transactions contemplated by this Agreement will be in compliance with applicable laws.

7.2    **Conditions to Obligations of Buyer.**    The obligations of Buyer to consummate any Purchase contemplated hereby shall be subject to the fulfillment, at or prior to the Closing Date for such Purchase, of the following additional conditions:

(a)    **Representations and Warranties True.**    The information set forth in Exhibit A or, as applicable, any Purchase Supplement and all schedules and exhibits attached thereto is true and accurate in all material respects as it relates to the Accounts. The representations and warranties of the Provider contained in this Agreement, or in any other document of such party delivered pursuant hereto shall be true and correct in all material respects on the Closing Date for such Purchase, and on such Closing Date the Provider shall have delivered to Buyer a certificate to such effect signed by the President or any Vice President and the Secretary or any Assistant Secretary of the Provider.

(b)    **Performance of the Provider.**    Each of the obligations of the Provider to be performed by it on or before the Closing Date for any Purchase pursuant to the terms of this Agreement shall have been duly performed in all material respects on or before such Closing Date, and at the Closing related thereto, the Provider shall have delivered to Buyer a certificate to such effect signed by the President or any Vice President and the Secretary or any Assistant Secretary of the Provider.

(c)    **Authority.**    All actions required to be taken by, or on the part of, the Provider to authorize the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby shall have been duly and validly taken by the Board of Directors of the Provider.

(d)    **Delivery of Documentation.**    Buyer shall have received the following documentation:

(1)    in the case of the initial Closing Date, copies, certified by the Secretary or any Assistant Secretary of the Provider, of resolutions of the Board of Directors of the Provider or the Executive Committee thereof and the resolutions of the shareholders of such party (if required) authorizing the execution, delivery and performance of this Agreement and all other Agreements, documents and instruments relating hereto and the consummation of the transactions contemplated hereby; in the form as attached hereto as "Exhibit B";

(2)    in the case of the initial Closing Date, Form UCC-1 financing statement(s) executed by the Provider, evidencing the security interest in all accounts receivable of the Provider (other than the Accounts being purchased) as provided in Section 2.4 hereof, in form and substance satisfactory to Buyer and duly filed with the appropriate governmental authority;

(3)    in the case of each Purchase, Form UCC-1 financing statement(s) executed by the Provider, evidencing the sale of the Accounts from the Provider to the Buyer as provided in Section 2.2 hereof, in form and substance satisfactory to counsel for Buyer and duly filed with the appropriate governmental authority;

(4)    bill of sale and assignment in the form as attached hereto as "Exhibit C", and powers of attorney, in form and substance attached hereto as "Exhibit D" or reasonably satisfactory to counsel for Buyer, with respect to the Assets to be purchased on such Closing Date;

(5)    such further instruments of sale, transfer, conveyance, assignment or delivery covering the Assets or any portion thereof as Buyer may require to assure the full and effective sale, transfer, conveyance, assignment or delivery of the Assets to Buyer;

14

MCC00014

(6)     a receipt evidencing the Provider's receipt of the Purchase Price for such Purchase in the form attached hereto as "Exhibit "E" defined in Section 2.1 hereof;

(7)     evidence that each Payor of the Accounts has received written notice from the Provider to the effect that the Accounts have been transferred to Buyer and all payments on the Accounts are to be sent directly to Buyer's Lock-Box Account; and

(8)     a Certificate of Custodian of Records for the Accounts, naming the Buyer or Buyer's Administrator as custodian of the medical records related to the Accounts in a form attached hereto as "Exhibit F";

(9)     such other closing documents as Buyer may reasonably request.

(e)     **No Adverse Changes**.  Since the date of this Agreement and the Closing Date for such Purchase there shall not have occurred any damage, destruction or loss with respect to any of the related Assets, whether or not covered by insurance, nor shall there have occurred any other event or condition which has made or which reasonably may be expected to have a material and adverse effect on the value of such Assets.

8.      **Miscellaneous**.

8.1     **Notices**.  All notices, requests, demands, and other communications hereunder shall be in writing and shall be deemed given (i) if delivered personally or (ii) three (3) days after mailed by certified or registered mail, postage prepaid, return receipt requested, or (iii) upon receipt if sent by prepaid telegram, telex or telecopy, in each case to the parties, their successors in interest or their assignees at the following addresses or telecopy numbers, or at such other addresses or telecopy numbers as the parties may designate by written notice in the manner aforesaid:

If to Buyer to:     MCC Special Purpose Corporation VIII
                    3770 Howard Hughes Parkway, Suite 301, Las Vegas, NV 89109
                    Fax no: (775) 825-5313

and; Buyer's Administrator:
                    Medical Capital Corporation
                    2100 South State College Blvd, Anaheim, CA 92806
                    Fax No.: (714) 935-3114

If to the Provider, to the address or telecopy number set forth in the first paragraph of this Agreement.

8.2     **Assignability and Parties in Interest**.  The parties hereto acknowledge and agree that this Agreement, including all rights and obligations contained herein, may be sold, assigned or otherwise transferred, in whole or in part, by Buyer in its sole and absolute discretion without the consent of the Provider. This Agreement is not assignable by the Provider. This Agreement shall inure to the benefit of and be binding upon Buyer and the Provider, and their respective permitted successors and assigns. This Agreement shall not benefit or create any right or cause of action in any or on behalf of any person or entity other than the parties hereto and their respective permitted successors and assigns, assignable by the Provider. This Agreement shall not benefit or create any right or cause of action in any or on behalf of any person or entity other than the parties hereto and their respective permitted successors and assigns.

8.3     **Counterparts**.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which shall constitute but one and the same Agreement.

8.4     **Severability**.  Any provision of this Agreement which is invalid, illegal, or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity, illegality, or unenforceability,

15

MCC00015

without affecting in any way the remaining provisions hereof in such jurisdiction or rendering that or any other provision of this Agreement invalid, illegal, or unenforceable in any other jurisdiction.

**8.5    Due Diligence Investigation.**  All representations and warranties contained herein which are made to the best knowledge of a party shall require that such party make reasonable investigation and inquiry with respect thereto to ascertain the correctness and validity thereof. No investigation or inquiry made by or on behalf of Buyer shall in any way affect or lessen the representations, warranties and covenants made and entered into by the Provider hereunder.

**8.6    Origination Fee; Expenses of Transaction and Enforcement.**  The Provider shall pay to Buyer, on each Closing Date, an origination fee (the "Origination Fee") specified in Exhibit A hereto and, if applicable, Schedule 1 to any Purchase Schedule. The Provider shall be responsible for paying all sales and transfer taxes, together with all other transfer or recordation fees and expenses including any legal fees and costs associated therewith, arising out of the transfer of the Assets to Buyer pursuant to the terms of this Agreement.

**8.7    Construction.**  This Agreement shall, in all cases, be construed simply, according to its fair meaning, and not strictly for or against either party. Any section and paragraph headings contained in this Agreement are for convenience of the reference only and shall not affect the construction or interpretation of this Agreement.

**8.8    Survival of Representations and Warranties.**  All representations, warranties, covenants and indemnities made by the parties in this Agreement or in any instrument or document furnished in connection herewith shall survive the initial Closing and any subsequent Closing for the sale of Accounts to Buyer.

**8.9    Governing Law; Submission to Process.**  PROVIDER HEREBY IRREVOCABLY SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS SITTING IN THE STATE OF NEVADA AND AGREES AND CONSENTS THAT SERVICE OF PROCESS MAY BE MADE UPON IT IN ANY LEGAL PROCEEDING RELATING TO THIS AGREEMENT, THE PURCHASE OF ACCOUNTS OR ANY OTHER RELATIONSHIP BETWEEN PROVIDER AND BUYER BY ANY MEANS ALLOWED UNDER NEVADA OR FEDERAL LAW. ANY LEGAL PROCEEDING ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT, THE PURCHASE OF ACCOUNTS OR ANY OTHER RELATIONSHIP BETWEEN PROVIDER AND BUYER SHALL BE BROUGHT AND LITIGATED EXCLUSIVELY IN ANY ONE OF THE UNITED STATES DISTRICT COURTS SITTING IN THE STATE OF NEVADA TO THE EXTENT IT HAS SUBJECT MATTER JURISDICTION, AND OTHERWISE IN ANY COURT OF THE STATE OF NEVADA HAVING JURISDICTION. NOTWITHSTANDING THE FOREGOING, BUYER RESERVES THE RIGHT, IN ITS SOLE AND ABSOLUTE DISCRETION, TO COMMENCE LEGAL ACTION AGAINST THE PROVIDER AND /OR GUARANTOR IN ANY OTHER JURISDICTION IN WHICH THE PROVIDER AND/OR GUARANTOR ARE DOING BUSINESS. THE PARTIES HERETO HEREBY WAIVE AND AGREE NOT TO ASSERT, BY WAY OF MOTION, AS A DEFENSE OR OTHERWISE, THAT ANY SUCH PROCEEDING IS BROUGHT IN AN INCONVENIENT FORUM OR THAT THE VENUE THEREOF IS IMPROPER."

Initials of Provider

**8.10    Waiver of Jury Trial, Punitive and Consequential Damages, etc.**  EACH OF PROVIDER AND BUYER HEREBY (A) IRREVOCABLY WAIVES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY AT ANY TIME ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY OR ASSOCIATED HEREWITH; (B) IRREVOCABLY WAIVES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY SUCH LITIGATION ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES, OR DAMAGES OTHER THAN, OR IN ADDITION TO,

16

MCC00016

ACTUAL DAMAGES; (c) CERTIFIES THAT NO PARTY HERETO NOR ANY REPRESENTATIVE OR AGENT OR COUNSEL FOR ANY PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, OR IMPLIED THAT SUCH PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVERS; AND (D) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY, AMONG OTHER THINGS, BY THE MUTUAL WAIVERS AND CERTIFICATIONS CONTAINED IN THIS SECTION 8.10. PROVIDER AUTHORIZES ANY ATTORNEY TO APPEAR FOR PROVIDER, IN ANY COURT OF RECORD, WITHOUT PRIOR NOTICE OR DEMAND FOR PAYMENT, TO WAIVE THE ISSUANCE AND SERVICE OF PROCESS, AND TO CONFESS JUDGMENT AGAINST PROVIDER IN FAVOR OF BUYER, OR ANY OTHER PARTY THEN ENTITLED TO ENFORCE THE TERMS OF THIS AGREEMENT FOR SUCH AMOUNT, INCLUDING PRINCIPAL, INTEREST, REASONABLE ATTORNEYS' FEES, AND COSTS, AS PROVIDER MAY BE LIABLE TO BUYER BY REASON OF THIS AGREEMENT.

Initials of Provider

**8.11**   **Complete Agreement**.   THIS AGREEMENT, ANY PURCHASE SUPPLEMENT, THE EXHIBITS AND SCHEDULES HERETO AND THE DOCUMENTS DELIVERED OR TO BE DELIVERED PURSUANT TO THIS AGREEMENT SET FORTH THE ENTIRE UNDERSTANDING AND AGREEMENT OF THE PARTIES HERETO WITH RESPECT TO THE TRANSACTIONS CONTEMPLATED HEREIN AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.   NO MODIFICATION OR AMENDMENT OF OR SUPPLEMENT TO THIS AGREEMENT OR SUCH OTHER DOCUMENTS SHALL BE VALID OR EFFECTIVE UNLESS THE SAME IS IN WRITING AND SIGNED BY THE PARTY AGAINST WHOM IT IS SOUGHT TO BE ENFORCED.

**8.12**   **Equitable Relief**.   In the event Provider commits any act or omission which (i) prevents or unreasonably interferes with:  (a) Buyer's exercise of the rights and privileges arising under the power of attorney granted in Section 5.5 of this Agreement; or (b) Buyer's perfection of or levy upon the ownership or security interest granted in the Accounts, including any seizure of any Account, or (ii) constitutes a breach of any of its representations, warranties or covenants hereunder, such conduct will cause immediate, severe, incalculable and irreparable harm and injury, and shall constitute sufficient grounds to entitle Buyer to an injunction, writ of possession, or other applicable relief in equity, and to make such application for such relief in any court of competent jurisdiction, without any prior notice to Provider.

**8.13**   **Cumulative Rights**.   All rights, remedies and powers granted to Buyer in this Agreement, or in any other instrument or agreement given by Provider to Buyer, are cumulative and may be exercised singularly or concurrently with such other rights as Buyer may have.  These rights may be exercised from time to time as to all or any part of the Accounts purchased hereunder as Buyer in its discretion may determine.  Buyer may not waive its rights and remedies unless the waiver is in writing and signed by Buyer.  A waiver by Buyer of a right or remedy under this Agreement on one occasion is not a waiver of the right or remedy on any subsequent occasion.

**8.14**   **Attorney's Fees**.   Provider agrees to reimburse Buyer upon demand for all attorney's fees, court costs and other expenses incurred by Buyer in enforcing this Agreement and protecting or enforcing its interest in the Accounts or the Assets, in collecting the Accounts or the Assets, or in the representation of Buyer in connection with any bankruptcy case or insolvency proceeding involving Provider, the Assets, any Payor, or any Account.  At the time this Agreement is executed, Provider will reimburse Buyer for all of its attorneys fees and disbursements, Adjustments, and out-of-pocket expenses incurred in connection with the negotiation, preparation and execution of this Agreement.

**8.15**   **Interest**.   If any obligation of the Provider hereunder is not paid when due, such obligation shall bear interest at a per annum rate equal to 18 percent until the earlier of (i) payment in full of such obligation to Buyer or (ii) entry of a final judgment therefor, at which time the principal amount of any money judgment

17

remaining unsatisfied shall accrue interest at the highest rate allowed by applicable law. Provider and Buyer intend to contract in strict compliance with applicable usury law from time to time in effect. In furtherance thereof such parties stipulate and agree that none of the terms and provisions contained in this Agreement shall ever be construed to provide for interest in excess of the maximum amount of interest permitted to be charged by applicable law from time to time in effect. Neither Provider nor any present or future guarantors, endorsers, or other persons hereafter becoming liable for payment of any obligation hereunder shall ever be liable for unearned interest thereon or shall ever be required to pay interest thereon in excess of the maximum amount that may be lawfully charged under applicable law from time to time in effect and the provisions of this Section 8.15 shall control over all other.

9.      **Definitions**. When used herein, the following terms shall have the meanings set forth below:

9.1      "Eligible Account" means:

(a)      the obligor of which is a United States resident.

(b)      that is a valid and binding obligation of the obligor thereof enforceable against such obligor in accordance with its terms and is not subject to any dispute, offset, counterclaim or defense whatsoever;

(c)      that is denominated and payable in U.S. dollars in the United States;

(d)      that constitutes an "account" as defined in the Uniform Commercial Code as in effect in the jurisdiction governing the perfection of Buyer's ownership interest, or in the alternative, security interest therein;

(e)      as to which Buyer's security interest therein will be perfected as a valid ownership interest free and clear of all adverse claims or, in the alternative, as a first priority security interest under the applicable law upon consummation of the Purchase thereof by Buyer;

(f)      the payment of which is a direct obligation of a Payor;

(g)      with regard to which each of the representations and warranties of Provider set forth in Section 4.12 hereof is true and correct; and

(h)      the claim for payment has been submitted to the responsible Payor within 90 days prior to the applicable Closing Date and has been acknowledged by such Payor and is due and payable within 120 days of its Billing Date.

9.2      "Adjusted Value" means the Gross Face Value of an Account minus contractual adjustments, if any, and minus the contracted amount of the Patient Co-Payment, if any, as certified by the Provider prior to its acquisition from the Provider.

9.3      "Billing Date" means the day on which Provider submitted a claim or bill to a Payor for payment and collection of an Account.

9.4      "Gross Face Value" means the total billing amount of each Account inclusive of the amount of the Patient Co-Payment and the amount payable by a Payor.

9.5      "Patient Co-Payment" means the amount payable by the patient for the services provided by Provider and not payable by a Payor with regard to each Account.

9.6      "Payor" means Medicare, Medicaid, Champus, any other division of a state or the federal government, an insurance company, Health Maintenance Organization, Accredited Hospital, Skilled Nursing Facility, or Fortune 500 company. All of the preceding entities must be acceptable to the buyer's financial criteria.

18

MCC00018

9.7      "Payment Period" means that period commencing on the 1st day of each month through the last day of that month.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

Provider:                                                              Corporate Seal
Brandywine Health Services of Mississippi,
Inc., aka Choctaw County Medical Center

By: _____
Jeffrey A. Morse
President

Notary statement: This person appeared before this ____2nd____ day of __Aug.__, 2004 and signed this document as above  in the county of __Worceter__, State of __Monford__. My Notary Public stamp is affixed below.

_____
Notary Public Stamp & Authority

Commission Expires 8/1/08

Buyer:                                              Buyer's Administrator:
MCC Special Purpose Corporation VIII                 Medical Capital Corporation

By: _____        By: _____
Joseph J. Lampariello                               Joseph J. Lampariello
Chief Operating Officer                             Special Agent

19

MCC00019

9.7    "Payment Period" means that period commencing on the 1st day of each month through the last day of that month.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

Provider:                                                      Corporate Seal
Brandywine Health Services of Mississippi,
Inc., aka Choctaw County Medical Center

By: _____
    Jeffrey A. Morse
    President

Notary statement: This person appeared before this ___2nd___ day of ___Aug___, 2004 and signed this document as above in the county of ___Worcester___, State of ___Maryland___. My Notary Public stamp is affixed below.

_____
Notary Public Stamp & Authority
Commission Expires 8/1/08


Buyer:                                        Buyer's Administrator:
MCC Special Purpose Corporation VIII          Medical Capital Corporation


By: _____          By: _____
    Joseph J. Lampariello                         Joseph J. Lampariello
    Chief Operating Officer                       Special Agent


19

MCC00020

9.7    "Payment Period" means that period commencing on the 1st day of each month through the last day of that month.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

Provider:
**Brandywine Health Services of Mississippi, Inc, aka Choctaw County Medical Center**                          Corporate Seal

By: _Jeffrey A. Morse_
Jeffrey A. Morse
President

Notary statement: This person appeared before this _____ day of _____, 2004 and signed this document as above in the county of _____, State of _____. My Notary Public stamp is affixed below.

Notary Public Stamp & Authority

**Buyer:**
**MCC Special Purpose Corporation VIII**

**Buyer's Administrator:**
**Medical Capital Corporation**

By: _____
   Joseph J. Lampariello
   Chief Operating Officer

By: _____
   Joseph J. Lampariello
   Special Agent

19

MCC00021

## GUARANTY

The undersigned hereby personally, absolutely and unconditionally guarantee(s), jointly and severally, the payment and performance of Provider's representations, warranties and covenants under this Agreement and any Purchase Supplement, and agree(s) to pay to Buyer upon demand all losses, damages and expenses of Buyer resulting from and/or incurred in connection with any breach by Provider thereof. The undersigned shall be primarily liable for such obligations and Buyer may invoke the benefits of this guaranty without pursuing any remedies against Provider, without the necessity of joining all guarantors in any action hereon, and without proceeding against any collateral for such obligation.

SIGNED:

Jeffrey A. Morse

F:\DATA\FUNDING\PROVIDER\PURCHASE\PURCHASE.FRM

MCC00022

## EXHIBIT A

## INITIAL ACCOUNTS RECEIVABLE

See "Schedule 1" attached hereto and made a part hereof

| | | |
|---|---|---|
| Aggregate Gross Face Value............................... | $559,461.62 | |
| Aggregate Adjusted Value................................ | $318,957.38 | |
| Advance Rate Amount................................... | $255,165.90 | 80 % |
| Deferred Purchase Price............................... | $46,503.99 | 14.58 % |
| Discount to Buyer.................................... | $17,287.49 | 5.42 % |
| Origination Fee.................................... | $9,568.72 | 3 % |

Jeffrey A. Morse
President

MCC00023

## EXHIBIT A

### INITIAL ACCOUNTS RECEIVABLE

See "Schedule 1" attached hereto and made a part hereof

| | | |
|---|---|---|
| Aggregate Gross Face Value........................................ | $_____ | |
| Aggregate Adjusted Value.......................................... | $_____ | |
| Advance Rate Amount................................................ | $_____ | 80 % |
| Deferred Purchase Price.............................................. | $_____ | 14.58 % |
| Discount to Buyer....................................................... | $_____ | 5.42 % |
| Origination Fee........................................................... | $_____ | 3 % |

Jeffrey A. Morse
President

MCC00024

**Exhibit A**
**Schedule 1**
**List of Accounts Receivable**

22

MCC00025

Exhibit B

## SECRETARY'S CERTIFICATE

**I, the undersigned,** as Secretary of Brandywine Health Services of Mississippi, Inc., aka Choctaw County Medical Center, a Mississippi corporation, ("Corporation"), hereby certifies that:

(1)      Attached hereto as Item 1 (one)   is a true, correct and complete copy of the Articles of Incorporation of the Corporation as the same exist as of the date hereof; and

(2)      Attached hereto as Item 2 (two)   is a true, correct and complete copy of the By-Laws of the Corporation and  all amendments thereto as the same exist as of the date hereof; and

(3)      The named person(s) set forth in Item 3 (three)  attached hereto are duly elected, qualified and acting Authorized Persons of the Corporation, holding the respective offices set forth opposite their names, and signatures set forth opposite their names are true, correct and authentic and genuine signatures of such person(s) on the date hereof; and

(4)      Attached hereto as Item 4 (four)  is a true, correct and complete copy of resolutions duly and validly adopted  by the Board of Directors of the Corporation and such resolutions have not been amended, modified or revoked in any respect and are in full force and effect on the date hereof.

The described Corporation is used in this Certificate and Items attached hereto, as the Provider as described in the Purchase Agreement of which this Secretary's Certificate is an exhibit.

**In witness whereof,** the undersigned has executed this Secretary's Certificate as of this 2nd day of August , 2004.

*Janet B. Morse*

Print Name: JANET B. Morse

23

**Exhibit B, Item 1.**

**Articles of Incorporation**

24

MCC00027

**F0001 – Page 1 of 2**

**OFFICE OF THE MISSISSIPPI SECRETARY OF STATE**
P.O. BOX 136, JACKSON, MS 39205-0136    (601) 359-1333
**Articles of Incorporation**

The undersigned, pursuant to Section 79-4-2.02 (if a profit corporation) or Section 79-11-137 (if a nonprofit corporation) of the Mississippi Code of 1972, hereby executes the following document and sets forth:

**1. Type of Corporation**

[X] Profit        [ ] Nonprofit

**2. Name of the Corporation**

Brandywine Health Services of Mississippi, Inc.

FILED
05/15/2002
ERIC CLARK
Secretary of State
State of Mississippi

**3. The future effective date is**
**(Complete if applicable)**

**4. FOR NONPROFITS ONLY:** The period of duration is [ ] years or [X] perpetual

**5. FOR PROFITS ONLY:** The Number (and Classes) if any of shares the corporation is authorized to issue is (are) as follows:

| Classes | # of Shares Authorized | If more than one (1) class of shares is authorized, the preferences, limitations, and relative rights of each class are as follows: | |
|---|---|---|---|
| 1 | 10,000 | | (See Attached) |
| | | | |

**6. Name and Street Address of the Registered Agent and Registered Office is**

| | |
|---|---|
| Name | Tadd Parsons |
| Physical Address | 324 East Cavers Avenue |
| P.O. Box | Post Office Drawer 6 |
| City, State, ZIP5, ZIP4 | Wiggins    MS    39577 |

**7. The name and complete address of each incorporator are as follows**

| | |
|---|---|
| Name | Danny J. Spreitler |
| Street | 416 Howard Street |

Rev. 01/96

MCC00028

**F0001 - Page 2 of 2**

**OFFICE OF THE MISSISSIPPI SECRETARY OF STATE**
**P.O. BOX 136, JACKSON, MS 39205-0136   (601) 359-1333**
**Articles of Incorporation**

| City, State, ZIP5, ZIP4 | Wiggins | MS | 39577 |
| --- | --- | --- | --- |
| Name | | | |
| Street | | | |
| City, State, ZIP5, ZIP4 | | | |
| Name | | | |
| Street | | | |
| City, State, ZIP5, ZIP4 | | | |
| Name | | | |
| Street | | | |
| City, State, ZIP5, ZIP4 | | | |

**8. Other Provisions** [ ]   See Attached

**9. Incorporators' Signatures (please keep writing within blocks)**

Rev. 01/96

MCC00029

**Exhibit B, Item 2.**

**By-Laws of the Corporation**

25

MCC00030

# BYLAWS
## OF
## BRANDYWINE HEALTH SERVICES OF MISSISSIPPI, INC.

### ARTICLE I. OFFICES

The principal office of the corporation in the State of Mississippi shall be located in the City of Meridian, County of Lauderdale. The corporation may have such other offices either within or without the State of Mississippi, as the Board of Directors may designate or as the business of the corporation may require from time to time.

### ARTICLE II. SHAREHOLDERS

SECTION I. Annual Meeting. The annual meeting of the Shareholders shall be held on the 12th day in the month of January in each year, beginning with the year 2003, at the hour of 10:00 a .m., for the purpose of electing Directors and for the transaction of such other business as may come before the meeting. If the day fixed for the annual meeting shall be a legal holiday in the State of Mississippi, such meeting shall be held on the next succeeding business day. If the election of Directors shall not be held on the day designated herein for any annual meeting of the shareholders, or at any adjournment thereof, the Board of Directors shall cause the election to be held at a special meeting of the Shareholders as soon thereafter as conveniently may be held.

SECTION II. Special Meetings. Special meetings of the shareholders, for any purpose or purposes, unless otherwise prescribed by statute, may be called by the President or by the Board of Directors, and shall be called by the President at the request of the holders of not less than five (5%) percent of all the outstanding shares of the corporation entitled to vote at the meeting.

SECTION III. Place of Meeting. The Board of Directors may designate any place, either within or without the State of Mississippi unless otherwise prescribed by statute, as the place of meeting for any annual meeting or for any special meeting called by the Board of Directors. A

MCC00031

Waiver of Notice signed by all Shareholders entitled to vote at a meeting may designate any place, either within or without the State of Mississippi, unless otherwise prescribed by statute, as the place for the holding of such meeting. If no designation is made, or if a special meeting be otherwise called, the place of meeting shall be the principal office of the corporation in the State of Mississippi.

SECTION IV.  Notice of Meeting.  Written notice stating the place, day and hour of the meeting and, in case of special meeting, the purpose or purposes for which the meeting is called, shall, unless otherwise prescribed by statute, be delivered not less than five nor more than ten days before the date of the meeting, either personally or by mail, by or at the direction of the President, or the Secretary, or the persons calling the meeting, to each Shareholder of record entitled to vote at such meeting. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail, addressed to the Shareholder at his address as it appears on the stock transfer books of the corporation, with postage thereon prepaid.

SECTION V.  Closing of Transfer Books or Fixing of Record Date.  For the purpose of determining Shareholders entitled to notice of or to vote at any meeting of Shareholders or any adjournment thereof, or Shareholders entitled to receive payment of any dividend, or in order to make a determination of Shareholders for any other proper purpose, the Board of Directors of the Corporation may provide that the stock transfer books shall be closed for a stated period but not to exceed, in any case, five days.  If the stock transfer books shall be closed for the purpose of determining Shareholders entitled to notice of or to vote at a meeting of shareholders, such books shall be closed for at least 10 days immediately preceding such meeting. In lieu of closing the stock transfer books, the Board of Directors may fix in advance a date as the record date for any such determination of shareholders, such date in any case to be not more than ten days and case of a

2

meeting of shareholders, not less than five days prior to the date on which the particular action, requiring such determination of shareholders, is to be taken. If the stock transfer books are not closed and no record date is fixed for the determination of Shareholders entitled to notice of or to vote at a meeting of shareholders, or Shareholders entitled to receive payment of a dividend, the date on which notice of the meeting is mailed or the date on which the resolution of the Board of Directors declaring such dividend is adopted, as the case may be, shall be the record date for such determination of shareholders. When a determination of Shareholders entitled to vote any meeting of Shareholders has been made as provided in this section, such determination shall apply to any adjournment thereof.

SECTION VI. Voting Lists. The officer or agent having charge of the stock transfer books for shares of the corporation shall make a complete list of the Shareholders entitled to vote at each meeting of Shareholders or any adjournment thereof, arranged in alphabetical order, with the address of and the number of shares held by each. Such list shall be produced and kept open at the time and place of the meeting and shall be subject to the inspection of any Shareholder during the whole time of the meeting for the purposes thereof.

SECTION VII. Quorum. A majority of the outstanding shares of the corporation entitled to vote, represented in person or by proxy, shall constitute a quorum at the meeting of shareholders. If less than a majority of the outstanding shares are represented at a meeting, a majority of the shares so represented may adjourn the meeting from time to time without further notice. At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally noticed. The Shareholders present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the

3

withdrawal of enough Shareholders to leave less than a quorum.

SECTION VIII. Proxies. At all meetings of shareholders, a Shareholder may vote in person or by proxy executed in writing by the Shareholder or by his duly authorized attorney in fact. Such proxy shall be filed with the secretary of the corporation before or at the time of the meeting. No proxy shall be valid after two (2) months from the date of its execution, unless otherwise provided in the proxy.

SECTION IX. Voting of Shares. Subject to the provisions of Section 12 of this Article II, each outstanding share entitled to vote shall be entitled to one (1) vote upon each matter submitted to a vote at a meeting of shareholders.

SECTION X. Voting of Shares by Certain Holders. Shares standing in the name of another corporation may be voted by such officer, agent or proxy as the Bylaws of such corporation may prescribe, or, in the absence of such provision, as the Board of Directors of such corporation may determine.

Shares held by an administrator, executor, guardian or conservator may be voted by him, either in person or by proxy, without a transfer of such shares into his name. Shares standing in the name of a trustee may be voted by him, either in person or by proxy, but no trustee shall be entitled to vote shares held by him without transfer of such shares into his name.

Shares standing in the name of a receiver may be voted by such receiver, and shares held by or under the control of a receiver may be voted by such receiver without the transfer thereof into his name if authority so to do be contained in an appropriate order of the Court by which such receiver was appointed.

A Shareholder whose shares are pledged shall be entitled to vote such shares until the shares

4

have been transferred into the name of the pledgee, and thereafter the pledgee shall be entitled to vote the shares so transferred.

Shares of its own stock belonging to the Corporation shall not be voted, directly or indirectly, at any meeting, and shall not be counted in determining the total number of outstanding shares at any given time.

SECTION XI. Informal Action by Shareholders. Unless otherwise provided by law, any action required to be taken at a meeting of the shareholders, or any other action which may be taken at a meeting of the shareholders, may be taken without a meeting if a consent in writing, set forth the action so taken, shall be signed by all of the Shareholders entitled to vote with respect to the subject matter thereof.

SECTION XII. Cumulative Voting. Unless otherwise provided by law, at each election for Directors every Shareholder entitled to vote at such election shall have the right to vote, in person or by proxy, the number of shares owned by him for as many persons as there are Directors to be elected and for whose election he has a right to vote, or to cumulate his votes by giving on candidate as many votes as the number of such Directors multiplied by the number of his shares shall equal, or by distributing such votes on the same principle among any number of candidates.

### ARTICLE III. BOARD OF DIRECTORS

SECTION I. General Powers. The business and affairs of the corporation shall be managed by its Board of Directors.

SECTION II. Number, Tenure and Qualifications. The number of Directors of the corporation shall be three. Each Director shall hold office until the next annual meeting of Shareholders and until his successor shall have been elected and qualified.

MCC00035

SECTION III. Regular Meetings. A regular meeting of the Board of Directors shall be held without other notice than this by-law immediately after, and at the same place as, the annual meeting of shareholders. The Board of Directors may provide, by resolution, the time and place for the holding of additional regular meetings without other notice than such resolution.

SECTION IV. Special Meetings. Special meetings of the Board of Directors may be called by or at the request of the President or any two directors. The person or persons authorized to call special meetings of the Board of Directors may fix the place for holding any special meeting of the Board of Directors called by them.

SECTION V. Notice. Notice of any special meeting shall be given at least ten (10) days previously thereto by written notice delivered personally or mailed to each Director at his business address or by telegram. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail to addressed, with postage thereon prepaid. If notice be given by telegram, such notice shall be deemed to be delivered when the telegram is delivered to the telegraph company. Any Director may waive notice of any meeting. The attendance of a Director at a meeting shall constitute a Waiver of Notice of such meeting, except where a Director attends a meeting for the express purpose of objecting to the transaction of any business because the meeting is not lawfully called or convened.

SECTION VI. Quorum. A majority of the number of Directors fixed by Section 2 of this Article III shall constitute a quorum for the transaction of business of any meeting of the Board of Directors, but if less than such majority is present at a meeting, a majority of the Directors present may adjourn the meeting from time to time without further notice.

SECTION VII. Manner of Acting. The act of the majority of the Directors present at a

6

MCC00036

meeting at which a quorum is present shall be the act of the Board of Directors.

SECTION VIII. Action Without a Meeting. Any action that may be taken by the Board of Directors at a meeting may be taken without a meeting if a consent in writing, setting forth the action so to be taken, shall be signed before such action by all of the Directors.

SECTION IX. Vacancies. Any vacancy occurring in the Board of Directors may be filled by the affirmative vote of a majority of the remaining Directors though less than a quorum of the Board of Directors, unless otherwise provided by law. A Director elected to fill a vacancy shall be elected for the unexpired term of his predecessor in office. Any directorship to be filled by reason of the Board of Directors for a term of office continuing only until the next election of Directors by the shareholders.

SECTION X. Compensation. By resolution of the Board of Directors, each Director may be paid his expenses, if any, if attendance at each meeting of the Board of Directors, and may be paid a stated salary as Director or a fixed sum for attendance each meeting of the Board of Directors or both. No such payment shall preclude any Director from serving the corporation in any other capacity and receiving compensation therefor.

SECTION XI. Presumption of Assent. A Director of the corporation who is present at a meeting of the Board of Directors at which action on any corporate matter is taken shall be presumed to have assented to the action taken unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent to such action with the person acting as the secretary of the meeting before the adjournment thereof or shall forward such dissent by registered mail to the Secretary of the corporation immediately after the adjournment of the meeting. Such right to dissent shall not apply to a Director who voted in favor of such action.

7

MCC00037

## ARTICLE IV.  OFFICERS

SECTION I.  Number.  The officers of the corporation shall be a President, a Vice-President, a Secretary and a Treasurer, each of whom shall be elected by the Board of Directors. Such other officers and assistant officers as may be deemed necessary may be elected or appointed by the Board of Directors.

SECTION II.  Election and Term of Office.  The officers of the corporation to be elected by the Board of Directors shall be elected annually by the Board of Directors at the first meeting of the Board of Directors held after each annual meeting of the shareholders.  If the election of officers shall not be held at such meeting, such election shall be held as soon thereafter as conveniently may be.  Each officer shall hold office until his successor shall have been duly elected and shall have qualified or until his death or until he shall resign or shall have been removed in the manner hereinafter provided.

SECTION III.  Removal.  Any officer or agent may be removed by the Board of Directors whenever in its judgment, the best interests of the corporation will be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed.  Election or appointment of an officer or agent shall not of itself create contract rights.

SECTION IV.  Vacancies.  A vacancy in any office because of death, resignation, removal, disqualification or otherwise, may be filled by the Board of Directors for the unexpired portion of the term.

SECTION V.  President.  The President shall be the principal executive officer of the corporation and, subject to the control of the Board of Directors, shall in general supervise and control all of the business and affairs of the corporation.  He shall, when present, preside at all

8

MCC00038

meetings of the Shareholders and of the Board of Directors. He may sign, with the Secretary or any other proper officer of the corporation thereunto authorized by the Board of Directors, certificates for shares of the corporation, any deeds, mortgages, bonds, contracts, or other instruments which the Board of Directors has authorized to be executed, except in cases where the signing and execution thereof shall be expressly delegated by the Board of Directors or by these Bylaws to some other officer or agent of the corporation, or shall be required by law to be otherwise signed or executed; and in general shall perform all duties incident to the office of President and such other duties as may be prescribed by the Board of Directors from time to time.

SECTION VI. Vice-President. In the absence of the President or in event of his death, inability or refusal to act, the Vice-President shall perform the duties of the President, and when so acting, shall have all the powers of and be subject to all the restrictions upon the President. The Vice-President shall perform such other duties as from time to time may be assigned to him by the president or by the Board of Directors.

SECTION VII. Secretary. The secretary shall: (a) keep the minutes of the proceedings of the Shareholders and of the Board of Directors in one or more books provided for that purpose; (b) see that all notices are duly given in accordance with the provisions of these Bylaws or as required by law; (c) be custodian of the corporate records and of the seal of the corporation and see that the seal of the corporation is affixed to all documents the execution of which on behalf of the corporation under its seal is duly authorized; (d) keep a register of the post office address of each Shareholder which shall be furnished to the Secretary by such shareholder; (e) sign with the President, certificates for shares of the corporation, the issuance of which shall have been authorized by resolution of the Board of Directors; (f) have general charge of the stock transfer books of the

9

MCC00039

corporation; and (g) in general, perform all duties incident to the office of Secretary and such other

duties incident to the office of Secretary and such other duties as from time to time may be assigned

to him by the President or by the Board of Directors.

SECTION VIII. Treasurer. The Treasurer shall: (a) have charge and custody of and be

responsible for all funds and securities of the corporation; (b) receive and give receipts for monies

due and payable to the corporation from any source whatsoever, and deposit all such monies in the

name of the corporation in such banks, trust companies or other depositories as shall be selected in

accordance with the provisions of Article V of these Bylaws; and (c) in general, perform all of the

duties as from time to time may be assigned to him by the President or by the Board of Directors.

If required by the Board of Directors, the Treasurer shall give a bond for the faithful discharge of his

duties in such sum and with such surety or sureties as the Board of Directors shall determine.

SECTION IX. Salaries. The salaries of the officers shall be fixed from time to time by the

Board of Directors and no officer shall be prevented from receiving such salary by reason of the fact

that he is also a Director of the corporation.

### ARTICLE V. CONTRACTS, LOANS, CHECKS AND DEPOSITS

SECTION I. Contracts. The Board of Directors may authorize any officer or officers, agent

or agents, to enter into any contract or execute and deliver any instrument in the name of and on

behalf of the corporation, and such authority may be general or confined to specific instances.

SECTION II. Loans. No loans shall be contracted on behalf of the corporation and no

evidences of indebtedness shall be issued in its name unless authorized by a resolution of the Board

of Directors. Such authority may be general or confined to specific instances.

SECTION III. Checks, Drafts, etc. All checks, drafts or other orders for the payment of

10

MCC00040

money, notes or other evidences of indebtedness issued in the name of the corporation, shall be signed by such officer or officers, agent or agents of the corporation and in such manner as shall from time to time be determined by resolution of the Board of Directors.

SECTION IV. Deposits. All funds of the corporation not otherwise employed shall be deposited from time to time to the credit of the corporation in such banks, trust companies or other depositories as the Board of Directors may select.

ARTICLE VI. CERTIFICATES FOR SHARE AND THEIR TRANSFER

SECTION I. Certificates for Shares. Certificates representing shares of the corporation shall be in such form as shall be determined by the Board of Directors. Such certificates shall be signed by the President and by the Secretary or by such other officers authorized by law and by the Board of Directors so to do, and sealed with the corporate seal. All certificates for shares shall be consecutively numbered or otherwise identified. The name and address of the person to whom the shares represented thereby are issued, with the number of shares and date of issue, shall be entered on the stock transfer books of the corporation. All certificates surrendered to the corporation for transfer shall be cancelled and no new certificate shall be issued until the former certificate for a like number of shares shall have been surrendered and cancelled, except that in case of a lost, destroyed or mutilated certificate a new one may be issued therefor upon such terms and indemnity to the corporation as the Board of Directors may prescribe.

SECTION II. Transfer of Shares. Transfer of shares of the corporation shall be made only on the stock transfer books of the corporation by the holder of record thereof or by his legal representative, who shall furnish proper evidence of authority by power of attorney duly executed and filed with the Secretary of the corporation, and on surrender for cancellation of the certificate

11

MCC00041

for such shares. The person in whose name shares stand on the books of the corporation shall be deemed by the corporation to be the owner thereof for all purposes.

## ARTICLE VII. FISCAL YEAR

The fiscal year of the corporation shall begin on the 1st day of January and end on the 31st day of December in each year.

## ARTICLE VIII. DIVIDENDS

The Board of Directors may from time to time declare, and the corporation may pay, dividends on its outstanding shares in the manner and upon the terms and conditions provided by law and its articles of incorporation.

## ARTICLE IX. CORPORATE SEAL

The Board of Directors shall provide a corporate seal which shall be circular in form and shall have inscribed thereon the name of the corporation and the state of incorporation and the words "Corporate Seal".

## ARTICLE X. WAIVER OF NOTICE

Unless otherwise provided by law, whenever any notice is required to be given to any Shareholder or Director of the corporation under the provisions of these Bylaws or under the provisions of the Articles of Incorporation or under the provisions of the Business Corporation Act, a waiver thereof in writing signed by the person or persons entitled to such notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

## ARTICLE XI. AMENDMENTS

These Bylaws may be altered, amended or repealed and new Bylaws may be adopted by the Board of Directors at any regular or special meeting of the Board of Directors.

12

MCC00042

**Exhibit B, Item 3.**

**Authorized Officers**
**SAMPLES OF SIGNATURES**

| TITLE | NAME | SIGNATURE |
|---|---|---|
| President | Jeffrey A. Morse | |
| Vice-President | | |
| Treasurer | | |
| Secretary | | |

26

MCC00043

**Exhibit B, Item 4.**

RESOLUTIONS OF THE BOARD OF DIRECTORS
OF
**Brandywine Health Services of Mississippi, Inc., aka Choctaw County Medical Center**

RESOLVED, Brandywine Health Services of Mississippi, Inc., aka Choctaw County Medical Center (the "Provider") is authorized to execute, enter into, and deliver and perform according to the terms there of the following documents (the "Transaction Documents"):

1.   Purchase Agreement by and between MCC Special Purpose Corporation VIII (the "Buyer") and Brandywine Health Services of Mississippi, Inc., aka Choctaw County Medical Center (as the "Provider" therein) evidencing the sale of certain accounts from the Provider to the Buyer.

2.   The Bill of Sale to be given by the Provider in favor of the Buyer pursuant to the terms of paragraph 7.2(d)(4) of the aforedescribed Purchase Agreement.

3.   The Assignment to be given by the Provider in favor of the Buyer pursuant to the terms of paragraph 7.2(d)(4) of the aforedescribed Purchase Agreement.

4.   The Blanket Form UCC-1 financing statement to be given by the Provider in favor of the Buyer pursuant to the terms of paragraph 7.2(d)(2) of the aforedescribed Purchase Agreement.

5.   The Form UCC-1 financing statement to be given by the Provider in favor of the Buyer pursuant to the terms of paragraph 7.2(d)(3) of the aforedescribed Purchase Agreement.

RESOLVED, that the President or any Senior Vice President or any Vice President or Secretary or any Assistant Secretary of the Provider and each of them be, and they each hereby are, authorized, for and on behalf of the Provider, to execute and deliver the above identified documents substantially in the form identified above, which are hereby approved, with such changes therein, additions thereto and deletions therefrom as the officer of the Provider executing such documents may approve, and the execution and delivery of such documents by such officer of the Provider shall constitute conclusive evidence of such officer's approval therefor.

RESOLVED, that the officers of the Provider be, and each hereby is authorized, for and on behalf of the Provider, to execute and deliver such other documents, agreements or instruments and to take such other action as they, or any of them, may deem necessary or advisable to carry out the purpose of the foregoing resolutions.

I, Janet R. Morse   Secretary of Brandywine Health Services of Mississippi, Inc., aka Choctaw County Medical Center, do hereby certify that:

(1)   The foregoing is a true and correct copy of resolutions adopted by the Board of Directors of Brandywine Health Services of Mississippi, Inc., aka Choctaw County Medical Center, on August 2, 2004.

(2)   The resolutions adopted by the Board of Directors have not been amended or rescinded and the same are, on the date of this Certificate, in full force and effect.

IN WITNESS WHEREOF, the undersigned has executed this Certificate and affixed the seal of Brandywine Health Services of Mississippi, Inc., aka Choctaw County Medical Center, on August 2, 2004.

By: Janet B. Morse
Print Name: Janet B. Morse
Its: Secretary

Corporate Seal

27

MCC00044

**Exhibit B, Item 4.**

RESOLUTIONS OF THE BOARD OF DIRECTORS
OF
Brandywine Health Services of Mississippi, Inc., aka Choctaw County Medical Center

RESOLVED, Brandywine Health Services of Mississippi, Inc., aka Choctaw County Medical Center (the "Provider") is authorized to execute, enter into, and deliver and perform according to the terms there of the following documents (the "Transaction Documents"):

1.    Purchase Agreement by and between MCC Special Purpose Corporation VIII (the "Buyer") and Brandywine Health Services of Mississippi, Inc., aka Choctaw County Medical Center (as the "Provider" therein) evidencing the sale of certain accounts from the Provider to the Buyer.

2.    The Bill of Sale to be given by the Provider in favor of the Buyer pursuant to the terms of paragraph 7.2(d)(4) of the aforedescribed Purchase Agreement.

3.    The Assignment to be given by the Provider in favor of the Buyer pursuant to the terms of paragraph 7.2(d)(4) of the aforedescribed Purchase Agreement.

4.    The Blanket Form UCC-1 financing statement to be given by the Provider in favor of the Buyer pursuant to the terms of paragraph 7.2(d)(2) of the aforedescribed Purchase Agreement.

5.    The Form UCC-1 financing statement to be given by the Provider in favor of the Buyer pursuant to the terms of paragraph 7.2(d)(3) of the aforedescribed Purchase Agreement.

RESOLVED, that the President or any Senior Vice President or any Vice President or Secretary or any Assistant Secretary of the Provider and each of them be, and they each hereby are, authorized, for and on behalf of the Provider, to execute and deliver the above identified documents substantially in the form identified above, which are hereby approved, with such changes therein, additions thereto and deletions therefrom as the officer of the Provider executing such documents may approve, and the execution and delivery of such documents by such officer of the Provider shall constitute conclusive evidence of such officer's approval therefor.

RESOLVED, that the officers of the Provider be, and each hereby is authorized, for and on behalf of the Provider, to execute and deliver such other documents, agreements or instruments and to take such other action as they, or any of them, may deem necessary or advisable to carry out the purpose of the foregoing resolutions.

I, _Janet B. Morse_    Secretary of Brandywine Health Services of Mississippi, Inc., aka Choctaw County Medical Center, do hereby certify that:

(1)    The foregoing is a true and correct copy of resolutions adopted by the Board of Directors of Brandywine Health Services of Mississippi, Inc., aka Choctaw County Medical Center, on _August 3_, 2004.

(2)    The resolutions adopted by the Board of Directors have not been amended or rescinded and the same are, on the date of this Certificate, in full force and effect.

IN WITNESS WHEREOF, the undersigned has executed this Certificate and affixed the seal of Brandywine Health Services of Mississippi, Inc., aka Choctaw County Medical Center, on _____, 2004.

By: _Janet K. Morse_
Print Name: _Janet B Morse_
Its: Secretary

Corporate Seal

27

MCC00045

**Exhibit C**

## ASSIGNMENT OF RECEIVABLES

For value received, the undersigned, Brandywine Health Services of Mississippi, Inc., aka Choctaw County Medical Center, a Mississippi Corporation., ("Assignor"), hereby assigns, transfers, and conveys without recourse to MCC Special Purpose Corporation VIII ("Assignee") all of its right, title and interest, whether now held or hereafter obtained, in and to the medical accounts receivable described in Exhibit "A" of the Purchase Agreement dated the _____ of _____, 2004 and hereby incorporated by reference and any substitutions thereof pursuant to Section 2.2 of the Purchase Agreement (the "Receivables"), and Assignor hereby warrants and represents that;

1. Assignor is the sole owner of the Receivables listed in Exhibit "A, Schedule 1", attached thereto" to the Purchase Agreement and is entitled to receive from such Receivable and has good right to sell, assign, transfer and set over the same and to grant to, and confer upon, Assignee the rights, interests, powers and authorities herein granted and conferred.

2. Assignor has not made any assignment other than this Assignment of the rights of Assignor with respect to said Receivables.

3. Borrower has neither performed and act or omitted to perform any act which might prevent the Assignee from, or limit Assignee in acting under any of the provisions of this Assignment.

4. All Receivables currently provide for all proceeds thereof to be paid directly to the Assignor.

5. To the best of the knowledge of Assignor, there exists no circumstances under which other persons or entities may have any claim against said Receivables.

6. This Assignment includes any and all tapes, claim forms, claim documentation, computer runs, servicing reports, printouts, and any and all medical records of any kind relating to the Receivables, including a guaranty of access by Assignor, with respect to the Receivables, to such additional medical records and information as may be necessary or appropriate to process and collect the Receivables.

7. This Assignment also includes any collateral collections accounts, trust accounts, and lock box accounts, and any funds contained therein, relating to the Receivables.

8. This Assignment includes any other document or instrument representing security for payment of the Receivables, or any guaranty of payment of performance relating to the Receivables, which documents or instruments were assigned or transferred to Assignor in connection with the Receivables.

The Assignor further covenants and represents that it has not taken any action, and to the best of its knowledge no event has occurred which would result in (a) the creation of any security interests, liens, encumbrances, or claims against any of the Receivables or any defect in Assignor's title to any of the Receivables, (b) the creation of any defense, counterclaim, or off set available to any party obligated on any of the Receivables, (c) any compromise, discount, waiver, or other agreement on the part of Assignor that would affect the amount, maturity, interest rate, or any other material term or condition of any of the Receivables, or (d) Assignor having any reason to believe that any party obligated on the Receivables is unable or unwilling to pay any portion thereof, as such amount becomes due.

This assignment is effective immediately upon faxed confirmation from MCC Special Purpose Corporation VIII bank that the funds said receivables has been received and credited to Assignor's account.

IN WITNESS WHEREOF, the Assignor has executed this _____ day of _____ , 2004.

BY: _____
Jeffrey A. Morse
President

28

Exhibit D

## BILL OF SALE

**STATE OF:**   **Mississippi**
**COUNTY OF:**   **Choctaw**

## KNOW ALL MEN BY THESE PRESENT:

That for $10.00 and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Brandywine Health Services of Mississippi, Inc., aka Choctaw County Medical Center, a Mississippi Corporation., hereinafter referred to as (Assignor) does hereby assign, grant, bargain, deliver, transfer, sell and convey unto MCC Special Purpose Corporation VIII, a Nevada Corporation (Assignee) all its rights, title and interest in and to those certain medical accounts receivable and claims identified in Exhibit "A", of the Purchase Agreement which is attached hereto and incorporated herein by this reference.

In connection with this assignment, Assignor warrants as follows:

1. That it is the owner of such medical accounts receivable and claims and that such accounts and claims have not previously been sold, assigned, transferred, pledged, encumbered to or in favor of any other person or entity.

2. That none of the accounts receivable or claims listed on Exhibit "A" hereto are the subject to any asserted defense or right, and that Assignor does not know of any facts or circumstances which would give right to, or form the basis of, any defense of payment of offset.

3. The Health Care Service which forms the basis of the medical accounts receivable and claims, Exhibit "A", were actually rendered to a patient as set forth in the information furnished by Assignor to Assignee. With respect to the medical accounts receivable and claims, Exhibit "A", the amounts of each claim are recently due and payable by the Patients insurance carrier to Assignor.

Signed on this _____ day of _____, 2004.

**Assignee**
**MCC Special Purpose Corporation VIII**

By: _____
Joseph J. Lampariello
Chief Operating Officer

**Assignor**
**Brandywine Health Services of Mississippi, Inc.,**
**aka Choctaw County Medical Center**

By: _____
Jeffrey A. Morse
President

29

MCC00047

Exhibit D

## BILL OF SALE

**STATE OF:**    Mississippi
**COUNTY OF:**  Choctaw

### KNOW ALL MEN BY THESE PRESENT:

That for $10.00 and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Brandywine Health Services of Mississippi, Inc., aka Choctaw County Medical Center, a Mississippi Corporation., hereinafter referred to as (Assignor) does hereby assign, grant, bargain, deliver, transfer, sell and convey unto MCC Special Purpose Corporation VIII, a Nevada Corporation (Assignee) all its rights, title and interest in and to those certain medical accounts receivable and claims identified in Exhibit "A", of the Purchase Agreement which is attached hereto and incorporated herein by this reference.

In connection with this assignment, Assignor warrants as follows:

1.  That it is the owner of such medical accounts receivable and claims and that such accounts and claims have not previously been sold, assigned, transferred, pledged, encumbered to or in favor of any other person or entity.

2.  That none of the accounts receivable or claims listed on Exhibit "A" hereto are the subject to any asserted defense or right, and that Assignor does not know of any facts or circumstances which would give right to, or form the basis of, any defense of payment of offset.

3.  The Health Care Service which forms the basis of the medical accounts receivable and claims, Exhibit "A", were actually rendered to a patient as set forth in the information furnished by Assignor to Assignee.  With respect to the medical accounts receivable and claims, Exhibit "A", the amounts of each claim are recently due and payable by the Patients insurance carrier to Assignor.

Signed on this _____ day of _____, 2004.

**Assignee**
**MCC Special Purpose Corporation VIII**

**Assignor**
**Brandywine Health Services of Mississippi, Inc.,**
**aka Choctaw County Medical Center**

by:_____
    Joseph J. Lampariello
    **Chief Operating Officer**

by:_____
    Jeffrey A. Morse
    President

29

**Exhibit E**
### SPECIFIC POWER OF ATTORNEY

*Know all men by these presents:* That **Brandywine Health Services of Mississippi, Inc., aka Choctaw County Medical Center** (Provider) hereby makes, constitutes and appoints Medical Capital Corporation, and its agent(s) as true and lawful attorney for me and in my name, place and stead and for my use and benefit in transaction of the following activities:

(a)     Accept delivery of, and inspect all mail and correspondence relating to and pursuant to the collection of all funds and payments due to me pursuant to our agreements;

(b)     To deposit all checks and payments made payable to me, for professional services rendered in the course of our agreement, into a trust account established for that purpose;

(c)     To take all steps necessary, including but not limited to, signing insurance claim forms on my behalf, in order to effectively submit and process all insurance claims accruing to me due to professional services rendered in the course of our agreement;

Provider grants to said attorney full power and authority to do and perform each and every act necessary or appropriate for the above purposes as fully as the undersigned might or could do if personally present, and the undersigned does hereby ratify all actions of said attorney which said attorney shall lawfully do or cause to be done by virtue of this *Specific Power of Attorney.*

My said attorney is empowered hereby to determine, in his sole discretion, the time when, the manner and purpose for which any power herein conferred upon him shall be exercised as well as the conditions, provisions, and covenants of any instruments or documents which may be executed by him pursuant thereto.

Executed this 2nd day of Aug, 2004.

        **Provider**
        **Brandywine Health Services of Mississippi, Inc., aka Choctaw County Medical**
**Center**

        Jeffrey A. Morse
        Title: President

Notary statement: This person appeared before this 2nd day of Aug, 2004 and signed this document as above in the county of Worcester, State of Maryland. My Notary Public stamp is affixed below.

Witnesseth

Commission Expires 8/1/08

30

MCC00049

**Exhibit F**
**Instructions for Disbursement of Purchase Price**

MCC Special Purpose Corporation VIII is hereby instructed on _____ , to deliver the sum of
$_____ ( _____
in the form of wire transfer of funds to: _____ Dollars),

> Brandywine Health Services of Mississippi, Inc,
> AKA Choctaw County Medical Center
> *Actual Account Name*

**In the care of the following bank:**

Bank Name: Union Planters Bank

Bank Branch Address: 111 Main St
*Street Address*

Ackerman    MS    39735
*City*    *State*    *Zip Code*

Bank Branch Phone Number: 662-285-6278

ABA: 084000084

Account Number: 9001034519

Name of Bank Officer to contact: Kenny Clark - VP

Telephone number of Bank Officer 662-285-6278

**Provider**
**Brandywine Health Services of Mississippi, Inc., aka Choctaw County Medical Center**

*Jeffrey A. Morse*
Jeffrey A. Morse
President

31

MCC00050

**Exhibit G**
## DECLARATION OF CUSTODIAN OF RECORDS

I, Jeffrey A. Morse,  have appointed Medical Capital Corporation, and or its agents, as Custodian of Records, in regard to the medical and patient files as attached hereto relating to the Purchase Agreement by and between Brandywine Health Services of Mississippi, Inc., aka Choctaw County Medical Center  and MCC Special Purpose Corporation VIII as identified in the Purchase Agreement.

Medical Capital Corporation and or its agent(s), shall keep in its possession, safeguard, maintain and present upon demand to authorized parties, individuals, physicians or other parties authorized by and upon written permission of the patient, or in the case of a minor, upon written permission of the minor's guardian, parent, or upon court order, each individual medical file, records, notes and other documentation relating to the files and accounts as described in the Purchase agreement as attached hereto.

Medical Capital Corporation, or its agent(s) shall safeguard said patient files and records in respect to each patient's confidentiality and regard to those applicable laws and professional codes.


Jeffrey A. Morse

**Medical Capital Corporation**

By:
Joseph J. Lampariello
Special Agent


WITNESSETH:


name:

32

MCC00051

**Exhibit G**
## DECLARATION OF CUSTODIAN OF RECORDS

I, Jeffrey A. Morse,  have appointed Medical Capital Corporation, and or its agents, as Custodian of Records, in regard to the medical and patient files as attached hereto relating to the Purchase Agreement by and between Brandywine Health Services of Mississippi, Inc., aka Choctaw County Medical Center  and MCC Special Purpose Corporation VIII as identified in the Purchase Agreement.

Medical Capital Corporation and or its agent(s), shall keep in its possession, safeguard, maintain and present upon demand to authorized parties, individuals, physicians or other parties authorized by and upon written permission of the patient, or in the case of a minor, upon written permission of the minor's guardian, parent, or upon court order, each individual medical file, records, notes and other documentation relating to the files and accounts as described in the Purchase agreement as attached hereto.

Medical Capital Corporation, or its agent(s) shall safeguard said patient files and records in respect to each patient's confidentiality and regard to those applicable laws and professional codes.

Jeffrey A. Morse

**Medical Capital Corporation**

By:_____
    **Joseph J. Lampariello**
    **Special Agent**

WITNESSETH:

_____
name:

32

MCC00052

# Exhibit "2"

File Number: 20040148885K
Date Filed: 08/10/2004 06:27 PM
Eric Clark
Secretary of State

# UCC FINANCING STATEMENT

## FILER INFORMATION

### CONTACT INFORMATION FOR FILER:

| CONTACT EMAIL kenneth.bray@choicepoint.com | CONTACT NAME ChoicePoint (LienGuard) | CONTACT PHONE | CONTACT FAX |
|---|---|---|---|

### SEND ACKNOWLEDGEMENT TO:

| PACKET # 2004CA00000118570010119271 3 | CLIENTS ACCOUNT # |
|---|---|

| ORGANIZATION NAME ChoicePoint (LienGuard) | | | |
|---|---|---|---|

| MAILING ADDRESS 1000 Alderman Dr | CITY Alpharetta | STATE GA | POSTAL CODE 30006 |
|---|---|---|---|

| COUNTY | COUNTRY | | |
|---|---|---|---|

## FILE RECORD

### RECORD DATA (UNIQUE SEQUENTIAL ID:0001)

| FILING TYPE Initial | | |
|---|---|---|

| FILERS UNIQUE ID | ALTERNATE NAME DESIGNATION | ALTERNATE FILING TYPE |
|---|---|---|

| ADDITIONAL INFORMATION 2004CA000001185700101 | |
|---|---|

## CURRENT NAME

### AFFECTED PARTY:

| ORGANIZATION NAME |
|---|

### AUTHORIZED DEBTOR:

| ORGANIZATION NAME |
|---|

### AUTHORIZED SECURED PARTY:

| ORGANIZATION NAME MCC Special Purpose Corporation VIII |
|---|

## DEBTOR DATA          (UNIQUE SEQUENTIAL ID: 001  )

| 1a. ORGANIZATION NAME Brandywine Health Services of Mississippi, Inc. | | | |
|---|---|---|---|

| 2d. TAX ID # SSN or EIN | 2e. TYPE OF ORGANIZATION Corporation | 2f JURISDICTION OF ORGANIZATION MS | 2g. ORGANIZATIONAL ID#, if any none |
|---|---|---|---|

| 1c. MAILING ADDRESS 148 West Cherry St. | CITY Ackerman | STATE MS | POSTAL CODE 39735 |
|---|---|---|---|

| COUNTY Choctaw | COUNTRY | ALTERNATIVE CAPACITY OF DEBTOR | |
|---|---|---|---|

## DEBTOR DATA                    (UNIQUE SEQUENTIAL ID:  002  )

| 1a. ORGANIZATION NAME | | | | |
|---|---|---|---|---|
| Choctaw County Medical Center | | | | |

| 2d. TAX ID # SSN or EIN | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID#, if any |
|---|---|---|---|
| | Corporation | MS | none |

| 1c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE |
|---|---|---|---|---|
| 148 West Cherry St. | | Ackerman | MS | 39736 |

| COUNTY | COUNTRY | ALTERNATIVE CAPACITY OF DEBTOR |
|---|---|---|
| Choctaw | | |

## SECURED PARTY DATA     (UNIQUE SEQUENTIAL ID:  001  )

| 3a. ORGANIZATION NAME | | | | |
|---|---|---|---|---|
| MCC Special Purpose Corporation VIII | | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE |
|---|---|---|---|
| 3770 Howard Hughes Parkway, Suite 301 | Las Vegas | NV | 89109 |

| COUNTY | COUNTRY | |
|---|---|---|
| | | |

**4. This FINANCING STATEMENT covers the following collateral:**

ALL ACCOUNTS RECEIVABLE, ALL RIGHTS AND INTERESTS OF DEBTOR IN AND TO ANY
MEDICAL ACCOUNTS RECEIVABLE, HEALTH-CARE INSURANCE RECEIVABLES, GENERAL
INTANGIBLES, AND CONTRACT RIGHTS, NOW EXISTING AND HEREAFTER ARISING AND ALL
PROCEEDS FOR ALL OF THE FOREGOING.

# Exhibit "3"

## Choctaw County Medical Center
148 W. Cherry Street
Ackerman, MS 39735
Phone 662-285-6235
Fax 662-285-2516

### Telefax Cover Sheet

TO: _Jared Rivera_

FAX #: _714-935-3114_

FROM: _Jeff Morse_

DATE: _8-12-2004_

Number of pages (including cover sheet): _3_

Message _____

If you do not receive all pages clearly or if you have questions, please call 662-285-6235.

### *****CONFIDENTIALITY NOTICE*****

The documents accompanying this telecopy transmission contain confidential information, belonging to the sender that is legally privileged. This information is intended only for the use of the individual or entity named above. The authorized recipient of this information is prohibited from disclosing this information to any other party and is required to destroy the information after its stated need has been fulfilled.

If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or action taken in reliance on the contents of these documents is strictly prohibited. If you have received this telecopy in error, please notify the sender immediately to arrange for return of these documents.

MCC00059

# *BHS*

*Brandywine Health Services of Mississippi, Inc.*
*Dba as Choctaw County Medical Center*
*148 West Cherry St.*
*Ackerman, MS 39735*

August 12, 2004

Medical Capital
2100 S. State College Blvd.
Anaheim, CA 92806
Attn: Mr. Jared Ricco

Jared,

This letter is to inform you we will not continue this program with your company under the present circumstances. The initial payment of $249,597.18 is simply not what was agreed upon.

You process will tie up all of our receivables even if you fund some amount weekly. Based on the first (or initial) funding, we will not be able to pay our bills. We discussed this at length and you arrived at a number for initial funding of $400 plus thousand which would have been acceptable. The initial funding obviously did not take into consideration any of the Nursing Home (Medicaid portion which was $180,000 nor did it cover the swing bed program which was $76,171.75). Had these numbers been included we could easily accomplished the criteria of the program. By you not accepting the Nursing Home, Swing Bed, Pro fees, and the rebill of co-pays and part B's we are going to fall way short of any goals we have for reducing our AR along with paying our monthly bills. Secondly, since you have excluded all of these items from the process, yet want full control by using a lock box and changing the address for where checks go. None of the extra money will every get to CCMC in time to pay our bills. I am truly surprised and dismayed at the amount of time we spent working with your people to make this work correctly that the final product is so poorly represented. I will not under any circumstance tolerate this sort of treatment. I attempt to bargain in good faith and tell people the truth even if it may not be in our best interests, obviously other to not share the same thoughts.

This morning, we are advising Medicare, Medicaid, our Bank (Union Planters) not to accept any documents for attachment of our funds. We are asking you to send us a final invoice covering the $249,597.18 and any reasonable associated costs. We will pay this bill in total within thirty days of receipt. I can also assure you that any attempts to attach our funds through execution of the EFT documents or the setting up of a lock box will be dealt with an immediate law suit by an appropriate Attorney in California working through or attorney. We are further advising Medicare & Medicaid and the State Attorney General of this problem and asking them to provide immediate action.

Jared, it is unfortunate this process has to end in this manner. However, I am not comfortable working with companies who do not do what they say they will do. Nor am I going to allow you to arbitrarily drive this hospital into the ground after so many people have worked very hard to make it a viable place to bring the sick the elderly and provide work for approximately 155 people in a poor rural county of Mississippi.

**(662) 285-6235 Off**                    **(662)-285-2516 Fax**
*Jmorse2754@Aol.Com*

1

MCC00060

**BHS**

*Brandywine Health Services of Mississippi, Inc.*
*Dba as Choctaw County Medical Center*
*148 West Cherry St.*
*Ackerman, MS 39735*

All further correspondence or questions regarding this should be directed to our Attorney,

Mr. J. Richard Barry
Bordeaux & Jones
505 21st Avenue
Meridian, Mississippi 39301
(601) 693-2393 (601) 484-6669 Direct Line (601) 693-0226 Fax

Respectfully submitted,

Jeffrey A. Morse
President Brandywine Health Services of Mississippi, Inc.

*(662) 285-6235 Off*

*Jmorse2754@Aol.Com*

*(662)-285-2516 Fax*

MCC00061

2